WALTER M. JACKSON

*v.*

HORACE E. HOOPER et al.

[Decided July 10th, 1909.]

1. While a business carried on by two or more persons for a profit, with a community of interest, and a share of profits and losses, is essentially a "partnership," these requirements may exist without creating a partnership, and there can be no partnership unless the agreement contemplates an agency whereby each is the agent for the other or others.

2. A "joint adventure" may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a common enterprise for their mutual benefit; they each have the right to demand and expect from their associates good faith in all that relates to their common interests.

3. Though there is a distinction between a partnership and a joint adventure, they are of a similar nature, and the rules of law applicable to partnerships apply to joint adventures, and equity will wind up a joint adventure because of misconduct of one of the parties and for an accounting, and in case of disagreement either party may sue for the dissolution of the agreement, and obtain an injunction to protect his rights.

4. A contract establishing a joint adventure need not be express, but may be implied from the conduct of the parties.

5. The parties to a joint adventure must act with the utmost good faith towards each other.

6. Complainant and defendant, engaging in business with third persons, bought out the third persons,.and then organized a corporation and carried on the business by their joint direction. They were equal stockholders in the corporation, and they managed it jointly with the aid of employes. Instead of dividends, they drew profits from the bank accounts of the business; each drawing substantially equal amounts. This corporation was liquidated and other corporations formed. They were equal holders of the stock of the new corporations; but *to comply with* the law a few shares were put in the names of two other persons. Defendant stated in a letter that the whole business was one concern. The receipts from the business, which was conducted in various countries, were deposited indiscriminately in the same banking accounts from which expenditures were made generally. The funds received from every source were deposited in banking accounts kept in different names, but were subject to withdrawal by complainant and defendant.—*Held*, that complainant and defendant were parties. to a joint adventure and were not partners.

On motion for preliminary injunction.

*Messrs. Lindabury, Depue & Faulks* and *Mr. Sherman L. Whipple* (of the Massachusetts bar), for the complainant.

*Mr. Robert H. McCarter, Messrs. Wollman & Wollman* and *Mr. Henry W. Taft* (of the New York bar), *Mr. Benjamin V. Becker* and *Mr. Jacob Newman* (of the Illinois bar), for the defendants.

HOWELL, V. C.

The theory of the bill in this case is that Walter M. Jackson and Horace E. Hooper are and for a number of years have been partners in business. The bill is filed for the purpose of dissolving the partnership and for an accounting of all the partnership affairs. It also prays for an injunction to restrain the defendants, Horace E. Hooper, Harris B. Burrows, Charles C. Whinery and Franklin H. Hooper from transferring or disposing of some shares of stock standing in the names of the said Harris B. Burrows, Charles C. Whinery and Franklin H. Hooper, on the books of two corporations, one an English corporation and the other a corporation organized under the laws of the State of Illinois; and also from withdrawing from the so-called partnership business any moneys for the private use of any of the defendants, and from interfering with the assets thereof, except in the regular course and in the ordinary conduct of the business, and from excluding the complainant from participation in the conduct of the business.

The bill alleges that prior to the year 1900 the complainant, Jackson, and Horace E. Hooper had been associated with James Clarke and George Clarke in the business of selling subscription books in England; that they purchased the Clarke interest in that business in March, 1900; that at that time an agreement was entered into between Jackson and Hooper which is set out in the bill as follows:

"That upon the acquisition of the Clarke interests and so long as they might be associated together in business, their general policy in respect to their joint undertakings should be determined by mutual assent; that

nothing should be done by either in connection therewith contrary to the wishes or against the interests of the other; that in respect of their said business enterprises, their ownership interests and authority and control in management should be on a basis of exact equality and that each should have and exercise the authority and control of equal partners; a further proviso being agreed upon to the effect that either might act alone in the routine conduct of the business in the absence of the other."

The bill further states that Jackson and Hooper carried on an extensive and very profitable subscription book business from 1900 until near the end of 1908; that a part of the business was conducted and carried on under the individual names of the complainant and the defendant Horace E. Hooper, and a part by the use of trade names assumed or acquired for the purpose; that a part of the business was conducted by them directly as individuals and other parts in the names of corporations organized by them for the purpose, and also through the agency of other individuals, but that their more important engagements and undertakings were made in their own names; that during this period the complainant and Hooper acquired the copyright and trade name of the Encyclopædia Britannica, the title to which was taken in their individual names, and that the business relating to the sale of the encyclopædia to individual customers was conducted in the name of some newspaper like the "London Times," or under some trade name adopted by them; that the accounts in the early history of the business were kept in the books of the Clarke Company, Ltd., but that the banking accounts in which were deposited the receipts from all their business were kept indiscriminately at that time either in the name of Jackson or Hooper or Clarke Company, Ltd., and that these accounts were subject to check by either Hooper or the complainant, and that each drew therefrom at will for his private use.

The bill further states that in order to avoid the provisions of the English Tax law, it was determined, in 1902, to liquidate the Clarke Company, Ltd., and to organize in its place two other companies, one under the English law, to be called Hooper & Jackson, Ltd., to transact business in Great Britain, and the other under the law of the State of New York, to be known as

the Encyclopædia Britannica Company, to transact the other business in which the complainant claims that he and Horace E. Hooper were engaged; that the complainant and Hooper were equal holders of the stock of these corporations, and are now equal holders of the stock of the English corporation; that in 1903, for reasons of convenience not now necessary to be stated, the complainant and Hooper organized a corporation under the laws of the State of Illinois, which they called the Encyclopædia Britannica Company, and which will hereafter be mentioned as the Illinois corporation; that this corporation issued its stock to the complainant and Hooper in equal shares, and they have owned and now own all the shares of that corporation, each being entitled to an equal number; that it became necessary to have other shareholders in these two corporations in order to comply with the provisions of the English and the Illinois law, and for this purpose four shares of the Illinois corporation and six shares of the English corporation were put in the names of Burrows, Whinery and F. H. Hooper, each of whom now claims to be a stockholder in the said corporation respectively; these are the shares of stock concerning which the complainant prays for an injunction.

The bill alleges further that the business in which these parties had embarked was carried on with great vigor and with great profit all over the world, and that accounts thereof were kept at a central office in London, the accounts relating to the English business after the liquidation of Clarke & Company, Ltd., being kept in the books of Hooper & Jackson, Ltd., and the accounts relating to the business in the other portions of the world being kept in the name of the Illinois corporation; that the cash receipts from the business in all the countries covered thereby were deposited indiscriminately in the same banking accounts, from which expenditures were made generally without regard to whether the business concerned was entered on one set of accounts or the other, or whether the business involved was that conducted in Great Britain or in foreign countries; that these accounts were kept in the name of Hooper & Jackson, Ltd., and in the names of Horace E. Hooper, the defendant, and Walter M. Jackson, the complainant, and until 1904, in the name of the

Illinois corporation; that these banking accounts were subject to drafts by Hooper or Jackson individually, and that during the entire period covered by the business, each one drew therefrom at will for his private and personal uses, and each one also drew indiscriminately from each or any of said accounts for the payment of obligations contracted indiscriminately in the name of the English corporation, the Illinois corporation, Walter M. Jackson and Horace E. Hooper; and that these drafts included also payment made for obligations incurred in the name of the "London Times" and other trade names used by them in the conduct of their business.

The bill further alleges that the profits drawn by Hooper and Jackson were drawn in the manner just indicated; that they drew substantially equal amounts; that they were not paid any salaries out of the corporation assets or out of any other assets of the business so called; that no dividends were ever declared by either of these corporations, except on one occasion when it became necessary for some purpose of convenience to declare a dividend of four hundred per cent. out of the surplus of Hooper & Jackson, Ltd.; that no meetings of the stockholders or of the directors of either of these corporations were ever held, except to comply with the most formal requirements of the statutes under which they were organized, and that until the controversy arose which is the foundation of this suit, neither of the said corporations as such had any active hand in the conduct of the enormous business which arose out of the sale by subscription of sets of the Encyclopædia Britannica. In fact the bill states that only four meetings of the directors of the Illinois company have ever been held; that when these meetings were held no business affairs or business policy was ever discussed; that the three nominal directors of the Illinois company and of the New York company, which preceded it were changed from time to time as Hooper and the complainant decreed, and that, in short, the whole business was conducted jointly by Hooper & Jackson as their own business, and that they made use of the corporations they had organized as mere agencies for carrying out the plans which the two principal parties from time to time agreed upon between themselves; and that the other directors as such had little or no

knowledge of and no participation in the very large business that was conducted by Messrs. Hooper and Jackson.

The bill further sets out large and important transactions touching the conduct of the said business which were carried through wholly by Hooper and Jackson without the aid of the corporations, and concerning which they made and executed contracts in their individual names. Particularly does the bill refer to an enterprise so conducted known as "The Times Book Club," which was a specially devised scheme for selling sets of the encyclopædia through the instrumentality of the "London Times." The bill states that the outstanding assets of the business, the legal title to which assets is in the two corporations, is very large, approximately two millions of dollars, and this, in addition to the title of the copyrights and publication rights of the encyclopædia, which, since June 1st, 1903, have stood, and now stand, in the name of the Illinois corporation, and which are valued by the complainant at a very large sum.

The bill further states that just prior to July, 1908, the defendant, Hooper, and the complainant had a disagreement in relation to their joint undertaking which arose out of a proposition to consolidate the encyclopædia business with the property known as the "London Times"; that negotiations were afterwards opened for the sale of the encyclopædia business as a whole; that the breach widened, and that finally steps were taken by Hooper, with the aid of Burrows, Whinery and Franklin H. Hooper, as directors in the Illinois corporation, to exclude the complainant from participation in the conduct of the business; that among other things complained of by him is that the by-laws of the Illinois corporation were amended so that the authority to conduct the entire business of the corporation was practically given to Horace E. Hooper, the president, and by making a majority of the stock necessary for a quorum at a stockholders' meeting, whereas previously the said Hooper and Jackson were equal stockholders, and no meeting could be held without their joint action. The bill alleges also that Hooper, who has obtained control of the English corporation, is threatening to turn over all its assets to the Illinois corporation, and that he has recorded a vote, he himself being the sole director present

at the meeting, authorizing the English company to turn over to the Illinois company sufficient of its assets to cancel a claim which it appears by its books to hold against the English company, but which the complainant says is purely fictitious; that although Jackson is the treasurer of the Illinois company, the board of directors, by a resolution passed in April of the present year, have practically deprived him of the power of signing checks, and that his authority to do so has been conferred upon an employe of the company who was elected to the office of assistant treasurer; and that having thus excluded the complainant from the conduct of the business, Hooper means to further disintegrate and destroy the general business by a wasteful and unnecessary sale and disposition of its assets. Complaint is made also that Hooper has been guilty of mismanagement of the business and has conducted the same extravagantly, and that in all these matters he has been aided by his brother Franklin H. Hooper, and by the two other directors of the Illinois corporation who hold their positions as stockholders in the company only by reason of the fact that they appear upon the books thereof to hold stock which really belongs jointly to the complainant and Horace E. Hooper.

There is hardly any proposition of fact contained in the bill which is not more or less specifically denied, with one very important exception that will be noted hereafter. In particular, does Mr. Hooper deny the making of the partnership agreement, which is set out at the beginning of the bill. He claims that he and Jackson never entered into any partnership agreement, that they never were partners, but that on the contrary, they were simply equal stockholders, in what are now two corporations, and that there is nothing in the case set out in upwards of five hundred printed pages of affidavits which would justify the court in charging him as a partner with the complainant in this business.

The fundamental feature of the complainant's case, as it is framed, is the agreement set out at the beginning of the bill which the complainant calls the partnership agreement. If no such agreement exists, or ever existed, it is difficult to perceive how the court can declare in favor of a strict partnership. If,

however, the court can imply an agreement from the acts and
conduct of the parties, then a different situation may ensue.
It is true that in some of the correspondence and in some of the
conversations Mr. Hooper and Mr. Jackson spoke and wrote of
each other as partners, each calling the other by that significant
name, and it is likewise true that there has been a uniform, sys-
tematic, energetic and successful course of business between these
two men which in the absence of an express agreement might in-
dicate an implied agreement or tacit understanding to carry on a
business jointly and for their joint benefit.

There are some statements which, for the purposes of this
motion, I shall assume to be facts. Hooper and Jackson engaged
in business with the Clarkes, bought them out in 1900 or there-
abouts, organized Clarke & Company, Ltd., and at that time
carried on the business by their joint direction; they were equal
stockholders in that early corporation; they managed it jointly,
with the aid of persons who were merely employes, and from
that time forward they appear to have employed the corporation
form as a mere agency for the convenient and proper conduct of
the extremely large business in which they were engaged. There
are a number of striking facts in this connection which may be
here spoken of. None of these companies ever paid any salaries
to either Hooper or Jackson, although they were making enor-
mous profits and acquiring large amounts of property. No divi-
dends were ever declared with the single exception herein above
mentioned. Instead of dividends upon their corporate stock,
Hooper and Jackson drew profits from the bank accounts of the
business; each drew against such accounts as he saw fit, and they
each drew a substantially equal amount. The corporation busi-
ness was carried on, not by meetings of the boards of directors,
but by consultation and agreement between Mr. Hooper and Mr.
Jackson, and they appear to have made and unmade these cor-
porations, in which they were equally interested, at their will.
Many references are made to "the business." Mr. Hooper, in a
letter written to his brother Franklin H. Hooper, on April 3d,
1905, comments upon the situation. He encloses in that letter
a debit memorandum from the New York office for £805, which
is to go through Mr. Muirhead's account on the books of the

Illinois company kept in its New York office. He says that he cannot see why this is sent, that there may be some good reason for it, but that it is beyond him; that Muirhead was sent to New York for the benefit of the New York office, and not for the benefit of the London office, and that if either ought to charge the other anything, it is the London office that ought to charge the New York office for letting Muirhead stay there. Then follows this significant sentence:

"I wish you would try and get it into somebody's head over there that the whole concern is one, and that it never does any good trying to rob one part of the business for the benefit of the other."

But perhaps the most cogent fact is the indiscriminate commingling of the accounts, fully set out on page eleven of the printed copy of the bill, and not denied by the principal defendant, or any of the affiants who come to his support. The complainant says that receipts from all the countries in which these gentlemen did business were deposited indiscriminately in the same banking accounts, from which expenditures were made generally without regard to whether the business concerned was entered on one set of accounts or the other, or whether the business involved was that conducted in Great Britain or in foreign countries; that funds received from every source alike were deposited in banking accounts kept in four different names and were subject to withdrawal by the principal parties to this litigation, and that they drew indiscriminately in any name used by them in the conduct of their business. While this statement lacks that degree of full and exact verification which ought to accompany so important a narration, inquiry was made by me on the argument concerning the truth of it, and I understood that it was not denied. This statement is wholly inconsistent with the defendant's claim that the business was conducted by the corporations; it shows that the corporation form was a mere form and lends credence to the statement of the complainant that the business was conducted by Mr. Hooper and himself, and that they used the corporations as mere agents.

It appears in the papers that Hooper and Jackson made a personal contract with Franklin H. Hooper by which they agreed

that in certain contingencies and for a certain consideration they would sell him a small percentage of the stock of the two companies; similar agreements were made with others. The coupling of the stock of the two corporations as the subject-matter of these contracts is also significant when taken in connection with Mr. Hooper's remark that the whole concern was one. Franklin H. Hooper now files an answer and cross-bill in which he sets up his contract and claims to be equitably entitled to the benefit of it upon the ground that he has paid some or all of the consideration therefor. I do not think I can regard him as an equitable shareholder in the company at the present time and for the purposes of this motion, because it appears that his rights to the stock is denied by the complainant who has attempted to rescind the contract; and to consider Mr. Franklin H. Hooper a stockholder by virtue of that contract, at this time, would be to decide that branch of the case in his favor on *ex parte* affidavits. Mr. Franklin H. Hooper is the holder, as I remember the statement, of one share of the stock of the Illinois corporation originally transferred to him to qualify him to become a director thereof. A significant fact relating to these qualifying shares, including his own, is that while they appear on the books of the company to stand in the name of these employes, as a matter of fact, the certificates were endorsed by them respectively and handed back to Mr. Franklin H. Hooper, who placed the same in the company's safe, indicating not a delivery, but the very opposite.

If the situation is as it is claimed to be by the complainant, then we have the spectacle of the complainant having wrested from him a hand in the control of a business in which he is interested to the extent of one-half, and this action is accomplished by the other half owner not by extraneous means but by the use and manipulation of the complainant's own stock.

I therefore find that the complainant and the defendant Horace E. Hooper were engaged as principals in a joint undertaking in which they had equal interests, and in which, until this controversy arose between them, they exercised equal control, and from which they derived and were entitled to equal shares of the

profits, and that the English and Illinois corporations were respectively agencies by which they accomplished their results.

The complainant claims that he and Horace E. Hooper were partners. If they occupied toward each other the legal relation of partners certain rights, duties and liabilities flow therefrom which will need to be considered. It is not always easy to define a partnership or to state in general terms what actual rights, duties and liabilities are included in the term. There must of course be a business to be carried on for profit; there must likewise be some sort of community of interest and a sharing of profits and losses; but all these requirements may exist and yet there may be no partnership. It was held in *Cox* v. *Hickman (1860), 8 H. L. C. 268,* in the opinion of Lord Cranworth and Lord Wensleydale, that the relation between so-called partners was best ascertained by inquiring whether their agreement was of such a nature as that one was agent for the other or the others. This requirement was adopted by our court of errors and appeals in *Wild* v. *Davenport (1886), 48 N. J. Law (19 Vr.) 129.* Mr. Justice Depue, speaking for the court, says: "My citation of authorities has been made with a view of showing that a right to receive a share of the profits of a business does not furnish an invariable test of a partnership even as to creditors; that a person not actually engaged in the business as a principal and not holding himself out as a partner, cannot be held for debts contracted in the business as dormant partner unless in virtue of some contract, express or implied, on his part in legal effect creating as between him and the persons actually carrying on the business the relation of principal and agent." *Cox* v. *Hickman* appears to express the law in England at the present time. *Bullen* v. *Sharp (1865), L. R. C. P. 86; 35 L. J. C. P. 105;* and see the opinions in the cases of *Mollwo* v. *Court of Wards (1872), L. R. 4 P. C. 419; Adam* v. *Newbigging (1888), 13 A. C. 308; 57 L. J. Ch. 1066.* I have failed to find any case in which our court of errors and appeals has receded from its adoption of the doctrine in *Wilde* v. *Davenport.* The rule is followed by the supreme court in *Seabury* v. *Bolles, 51 N. J. Law (22 Vr.) 103,* and by this court in *Hallenbach* v. *Rogers, 57 N. J. Eq. (12 Dick.) 199.* The rule is distinguished from that

applying to profit-sharing agreements in *Jernee* v. *Simonson,. 58 N. J. Eq. (13 Dick.) 282*, and in *Potter* v. *Morris & Cumings Dredging Co., 59 N. J. Eq. (14 Dick.) 422*. I take it therefore to be established law in this state that there can be no partnership within the proper meaning of that term, unless the agreement between the parties contemplates the sort of agency which is contemplated by the rule announced in *Cox* v. *Hickman*. This peculiar sort of agency is thus described by Sir George Jessel in *Pooley* v. *Driver (1876), 5 C. D. 458; 46 L. J. Ch. 466:* "It is the one person acting on behalf of the firm; he does not act as agent in the ordinary sense of the word for the others, so as to bind the others; he acts on behalf of the firm of which they are members, and as he binds the firm and acts on the part of the firm he is properly treated as the agent of the firm."

Mr. Justice Story, in the first section of his work on *Partnership,* says: "Every partner is an agent of the partnership,. and his rights, powers, duties and obligations are in many respects governed by the same rules and principles as those of an agent; a partner, indeed, virtually embraces the character both of a principal and of an agent. So far as he acts for himself and his own interest in the common concerns of the partnership,. he may properly be deemed a principal, and so far as he acts for his partners, he may as properly be deemed an agent." The case of *Carr* v. *Hertz, 54 N. J. Eq. (9 Dick.) 127; affirmed, 54 N. J. Eq. (9 Dick.) 700*, exemplifies another phase of the theory. There one member of a firm executed a chattel mortgage to secure a firm debt; the other party did not join; he dissented therefrom and so notified the chattel mortgagee. The chattel mortgage was declared to be void on the ground that the agency of the one partner to act for the firm had been revoked, and that the mortgagee had notice of it.

The application of this rule to the facts in this case leaves my mind in some doubt as to whether the agreement set out in the bill itself amounts to a partnership agreement, or whether the long course of dealing between the complainant and Horace E. Hooper would justify the inference that they considered that some sort of a partnership existed between them. The feature

which is inconspicuous is the fact of agency, which is put forward so prominently in the cases above cited. So far as I am able to observe there was never any transaction of real importance carried on in relation to the joint business which was not discussed and passed upon by the two principal parties in person. I find no transaction of any consequence that was carried through by either Mr. Jackson or Mr. Hooper alone.

This rather leads me to the view that the series of transactions set out in the bill were not strict partnership affairs, but belonged to that class of transactions which are known by the name of joint adventures; there is a class of cases which relate to persons who embark in such undertakings, but who do not enter upon the prosecution of their business as partners strictly. The case of *Ross* v. *Stevens (1888), 45 N. J. Eq. (18 Stew.) 231,* is an example. That case dealt with a real estate transaction in which the evidence of the relation of the parties was contained in a letter written by one to the other in which the writer said: "It is hereby distinctly understood and agreed that this purchase is a joint transaction involving you equally with me," and in another letter states that they are to share equally in any profit or loss resulting from the transaction. Vice-Chancellor Van Fleet held that the arrangement was not a partnership but a joint venture, and his judgment was affirmed on appeal. The report is meagre, but it is sufficient to differentiate a joint adventure from a partnership and to indicate the full jurisdiction of a court of equity over that class of cases. In *Warwick* v. *Stockton (1896), 55 N. J. Eq. (10 Dick.) 61,* Vice-Chancellor Pitney dealt squarely with the question. There an inventor sold to a manufacturer the exclusive right to manufacture and sell certain inventions; the manufacturer to furnish all the capital for the enterprise and to pay the inventor half the profits and a salary for his services. The vice-chancellor says, by way of distinguishing the case from *Wild* v. *Davenport, supra:* "There is no provision expressed or implied that the complainant [the inventor] should have the usual power of a partner as agent of the firm to bind the partnership and to take part in the details of the management of the business, nor is there anything in the agreement to indicate that he was to be-

come liable for any share of the losses if the business was unsuccessful. * * * These features show that the relations were not those of partners, but of a mere common interest in a joint adventure." He declined to appoint a receiver to wind up the business, but held the bill for an accounting.

Another case is *Simmons* v. *Lima Oil Co. (1906)*, *71 N. J. Eq. (1 Buch.) 174.* There Vice-Chancellor Garrison sustained a suit in equity to wind up a joint adventure because of the misconduct of one of the parties, and for an accounting.

While this distinction exists it has been held that the partnership and the joint adventure are of a similar nature, and that the rules of law which apply to partnerships apply also to joint adventures. In *Getty* v. *Devlin (1878)*, *54 N. Y. 408*, there was before the court a joint enterprise in which it was alleged that one of the parties had been guilty of a fraud upon the others. Concerning the law touching the relationship, Commissioner Earl says: "In all such cases, the subscribers enter into relations of trust and confidence with each other. They engage in a common enterprise for their mutual benefit, and have the right to demand and expect from their associates good faith in all that relates to their common interests. Equality and mutuality of burdens and benefits is implied in all such enterprises in proportion to the amounts subscribed, and no one of the subscribers can be permitted to take to himself a secret or separate advantage to the prejudice of his associates."

The same rule was announced by the supreme court of Pennsylvania in *McCutcheon* v. *Smith, 173 Pa. St. 101; 33 Atl. Rep. 881.*

In *Marston* v. *Gould, 69 N. Y. 220*, there was a joint adventure in the purchase and sale of shares of the capital stock of the Erie Railway Company, in which the funds were to be provided by the defendant, who was to bear the loss if a loss should ensue, but in which the plaintiff was to have one-fifth of the profit, if there was a profit. This transaction was held not to be a partnership, but a joint enterprise, and that as such it was terminable at any time by either of the parties, and that either could maintain an equitable action against the other for an accounting. See, also, *Hurley* v. *Walton, 63 Ill. 260; Edson* v.

*Gates, 44 Mich. 253; 6 N. W. Rep. 645.* In *Scudder* v. *Budd, 52 N. J. Eq.* (*7 Dick.*) *320,* the court of errors and appeals of this state held that in a case where the parties to the suit agreed to erect buildings to be sold at a profit, the defendant to advance the money, and the complainant to contribute his skill and time as superintendent, and to divide the profits equally, the complainant was entitled to an accounting without reference to the question whether a partnership existed between the parties. See *Hambleton* v. *Rhind, 84 Md. 456; 36 Atl. Rep. 597.*

And finally it has been held that a contract concerning a joint adventure does not need to be express, but may be implied from the conduct of the parties. In *Knapp* v. *Hanley, 108 Mo. App. 353; 83 S. W. Rep. 1005,* there was a joint enterprise alleged in the plaintiff's petition arising out of an express contract. Apparently, the plaintiff failed to prove the contract, and the court permitted the course of business between the parties to be offered in evidence. There was a demurrer to the evidence which came on for argument in the appellate court. I quote from the opinion: "The law did not devolve upon the plaintiff in the trial to establish the agreements declared on as express contracts of the parties, but it was legally sufficient to exhibit a state of facts from which such agreements might reasonably be inferred by the jury. The evidence expressly disclosed the joint employment and undertaking, but by legal implication in the absence of distinct separate agency, the authority conferred and rights acquired thereby are presumed to be joint. Words of express joinder are not essential, but language of severance must be applied and be present to produce several responsibility or right. * * * As a consequence of such joint agency the law exacted from them the highest degree of good faith, not only toward their principal, but also in all other dealings with each other, and it implied an agreement for an equal division of the compensation paid for their joint services by their common principal in their joint employment."

It thus appears that if these parties are joint adventurers, practically the same rules apply as apply to the relation of partnership. An agreement may be implied from the course of dealing, and when once the engagement has been made the

parties must act with the utmost good faith toward each other; in case of a disagreement either party may seek the aid of this court for the dissolution of the relation, and in case of misconduct of either party the injured party may have the same relief. The purpose of the court must be to ascertain what the contract, express or implied, between the parties, is, and to enforce it in accordance with the well-settled principles of equity jurisprudence.

In my opinion, the complainant is entitled to an injunction broad enough to hold the *status quo,* and yet so limited as not to interfere with the orderly, regular and usual conduct of the business. Any interference with the efficiency of its management at this stage of the litigation would be wrong and would not be desired by either of the parties. My present impression is that the injunctive order now in force attains the object just indicated, but I will hear counsel on the scope of the injunction within the limits above mentioned upon the settlement of the order.