Sometime in June, 1928, four silk dyeing establishments, which had been engaged in business in this state, merged *Page 392 
into one company and now exist under the name of Associated Dyeing and Printing Corporation of Paterson. The defendant Wirbelauer became its president, and Wiley, the complainant, became its treasurer. The complainant alleges Wirbelauer collected part of a commission paid Abraham Axelrod, a promoter and broker, for services in effecting the merger, and fraudulently retains such proceeds, despite an agreement to pay him thirty-three and a third per cent. of the same. The defendant Wirbelauer denies any agreement with complainant.
At the outset of the hearing, the defendant moved to strike the bill of complaint upon the following grounds: "1. That it does not set forth a cause of action cognizable in this court. 2. That complainant has an adequate, certain, complete and sufficient remedy at law. 3. That it does not sufficiently disclose that complainant is entitled to the relief prayed for, or any equitable relief. 4. That it does not set forth a good and sufficient equitable cause of action. 5. That complainant is not entitled to any equitable relief against defendant Wilgus Corporation, until the complainant first establishes his cause of action in a court of law, and recovers a judgment in a court of law against defendant William L. Wirbelauer." The motions were all denied.
The complainant alleges a joint adventure between him and the defendant Wirbelauer and the proof sustains him; therefore, his action is one that is clearly cognizable in a court of equity. An agreement of joint adventure is certainly a subject of equitable jurisdiction. It carries with it, among other things, a right of discovery and an accounting. Braddock v. Hinchman, 78 N.J. Eq. 270.
A joint venture has been defined as a special combination of two or more persons, where in some specific venture, a profit is jointly sought without any actual partnership or corporate designation. 33 Corp. Jur. 841 § 1. The relation of parties to a joint adventure is like that of co-partners; is fiduciary, one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits. Bowne v.Windsor, 106 N.J. Eq. 415. While a business carried on *Page 393 
by two or more persons for a profit, with a community of interest, and a share of profits and losses, is essentially a partnership, these requirements may exist without creating a partnership, and there can be no partnership unless the agreement contemplates an agency whereby each is the agent for the other or others. Jackson v. Hooper, 76 N.J. Eq. 185. A joint adventure, on the other hand, may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a common enterprise for their mutual benefit; they each have the right to demand and expect from their associates good faith in all that relates to their common interests. Though there is a distinction between a partnership and a joint adventure, they are of a similar nature; and the rules applicable to partnerships apply to joint adventures, and equity will wind up a joint adventure because of misconduct of one of the parties and order an account; and in case of disagreement either party may sue for the dissolution of the agreement, and obtain an injunction to protect his rights.Jackson v. Hooper, supra.
Wiley, the complainant, and Wirbelauer, the defendant, from the early part of 1921, were employed by a silk dyeing concern known as the Royal Piece Dye Works, Incorporated, of Paterson, New Jersey. Wirbelauer was president of the concern, while Wiley was its chief accountant, and, also assistant to the treasurer. Subsequently Wiley became secretary and chief financial officer of the company. He and Wirbelauer were closely associated, not only in business affairs, but in matters socially. Wirbelauer took him into his confidence, discussed with him many personal matters, and relied upon his aid and judgment in much of his private affairs.
Wiley claims credit for initiating the plan, and assisting in effecting the proceedings which led to the merger of the different companies mentioned in the bill. He testified that through one Henry Smith, a lawyer, he met Axelrod, the promoter or broker in the merger, who, on other occasions, *Page 394 
had discussed the question of the consolidation of the companies with Wirbelauer, but the discussion was without successful result. It appears from the testimony of complainant and his witnesses, Wiley arranged for and brought about a meeting between Axelrod and Wirbelauer, at which the consolidation of the different companies was then taken up, and the merger, in consequence, resulted. Axlrod admitted meeting Wiley through Smith; but he denied that any arrangements were made through Wiley for the merger. He did say that on an occasion, or occasions, Wiley was present at the conferences that were held between the bankers or financiers supporting the merger, and Wirbelauer. There was also testimony of others, who had been engaged in preparing necessary data for the merger, that Wiley assisted, and co-operated, with the persons engaged in that work.
Axelrod stated that he had no agreement with Wirbelauer about a division or apportionment of his commission; but he admitted giving Wirbelauer the sum of approximately $110,481.85 in cash and securities; some of it going to Wirbelauer and the rest going to the Wilgus Corporation — a holding company controlled by Wirbelauer and his family.
Wiley testified that as the merger arrangements were approaching finality, or had about been effected, Wirbelauer discussed with him the question of his, Wiley's compensation, saying: "I leave it up to you as to the amount." Wiley then mentioned thirty-three and one-third per cent. of whatever compensation Wirbelauer should receive; Wirbelauer said that proportion of his receipts mentioned by Wiley was satisfactory to him. Subsequently, according to Wiley, on an automobile trip to or from Princeton, Wirbelauer said to him: "We ought to have something in writing as a protection for our families." Wiley suggested to Wirbelauer that he have his stenographer prepare the stated agreement; Wirbelauer said "no, you do it." Wiley then prepared a memorandum of the agreement and handed it to Wirbelauer and that Wirbelauer thereupon signed it. The agreement was offered in evidence and reads as follows: *Page 395 
"December 12, 1927.
Mr. James A. Wiley, Paterson, N.J. My Dear Wiley:
This will confirm our mutual agreement that I will pay to you a cash sum equal to thirty-three and one-third per cent. of any moneys or the market value of any property that I may receive as commissions, fees, services, etc., which moneys may be paid to me by Abraham Axelrod, or others, by reason of the merger or consolidation of the Royal Piece Dye Works, Inc., with Cramer 
King Company, Colt Dye Works, Inc., and Uhlig Piece Dye Works, Inc., with any other company or concern, it being understood that payment shall be made to you in consideration of those services rendered by you in connection with the merger or consolidation and which payment shall be made immediately upon my receipt of the said moneys or property.
 Very truly yours, (Sgd) W.L. WIRBELAUER."
Axelrod said that he turned over to Wirbelauer in cash $72,500; and, also, eight thousand shares of the stock of the new company on one occasion, and, subsequently, eleven thousand shares of the stock of the new company, or a total number of nineteen thousand shares of stock; that much of that cash and stock were turned over to the Wilgus Corporation for the benefit of Wirbelauer.
Wirbelauer denied having any agreement with Wiley. He maintains Wiley is entitled to no part of the said commission, or proceeds, paid or given by Axelrod. He denies that Wiley had any part in bringing about, or effecting, the merger of the companies. He, in effect, stated that Wiley was a mere employe of the Royal Piece Dye Works, Incorporated; that, subsequently, he became treasurer of the new company; that they both had been employed by the Royal Piece Dye Works, Incorporated, for several years, and, in the course of their business relations, Wiley would present checks and correspondence to him for his signature, and because of their number, he would not read them, but, relying on Wiley's integrity, accepted them without question, and signed them. He admitted that the signature on the so-called agreement between him and Wiley, appeared to be his signature, but he would not state definitely that it was. He stated that he had no recollection of signing any such agreement. His *Page 396 
testimony is calculated to suggest the inferences that Wiley attempted to take advantage of the confidence reposed in him and that he had prepared the agreement knowing his, Wirbelauer's, practice of signing whatever papers Wiley presented to him, in the course of business, without examining them. Wirbelauer said he may have signed the agreement under these circumstances. But the suggestion is a baneful one and wholly unjustified by any evidence. His supposititious explanation does not "set well;" in my opinion, it does not bear the seal of truth or sincerity and lacks credit and is without basis in fact. The close, intimate and unbroken relation of friendship, of trust and of confidence existing between these two men over a span of years, alone would repel any such unwarranted inference.
After measuring the friendly business and social relations that prevailed between them for a long period, without any word or act to mar their bond of intimacy and confidence; and without evidence of misconduct, or of undue advantage being taken, where, then, can fraud be read into Wiley's conduct? As a general rule, fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence, word of mouth, or look, or gesture. It is any artifice by which a person is deceived to his disadvantage. To establish it, the proof must be clear and convincing. Certainly Wirbelauer's testimony, or that of any person who testified at the hearing, shows no fraud, or suggestion of fraud by Wiley, either by his speech, his silence, his word of mouth, his look, his gesture, or his conduct. In the case of Wolesin v. Iavarone, 112 N.J. Eq. 409, the court said: "Fraud must be clearly established; mere suspicion is not enough." Certainly suspicion falls far short of proof; and suspicion does not arise even slightly against Wiley. However, there is considerable ground for a belief in the existence of fraud and deception in the acts and attitude of Wirbelauer. His suggestion to Wiley that since they were both identified in an official capacity with the merged company, that it would be *Page 397 
unethical to accept any money, or reward, for their work in the merger, and, then, for him, in the face of his declaration to render gratuitous service, to accept commissions from Axelrod within approximately a week later, certainly brands his conduct with double dealing and stigmatizes his attitude with premeditated fraud. Wiley did not discover his associate's perfidy until Wirbelauer's secretary sought his advice about the receipt of a $90,000 "royalty" item in an income tax report which she exhibited to him. It is pertinent to say that Wiley on almost every other occasion had prepared the income tax reports for Wirbelauer and the Wilgus Corporation; and it is significant that Wirbelauer had his secretary, and not Wiley, attend to it after the cash and stocks were paid to him and the Wilgus Corporation by Axelrod.
In my opinion, the complainant has shown beyond doubt his right to a part of the proceeds given by Axelrod to Wirbelauer, or to the Wilgus Corporation for his benefit, or whatever was given to it at Wirbelauer's direction; and I believe all the circumstances indicate that Wirbelauer tried to conceal the receipt of the cash and stock, which Axelrod gave him, and that he transferred, or had transferred, the cash and stock to the Wilgus Corporation for the purpose of concealing it from the complainant's knowledge; and that there were acts, omissions and concealments on the part of Wirbelauer which involve a breach of legal or equitable duty, and that he took an undue and unconscientious advantage of the trust which Wiley reposed in him. Riverside Trust Co. v.Collin, 114 N.J. Eq. 157. I believe the proofs amply support the allegations of the bill. Riehl v. Riehl, 101 N.J. Eq. 15.
I shall advise a decree to the effect that the Wilgus Corporation is a trustee to the extent of thirty-three and one-third per cent. of the moneys or stock paid by Axelrod to Wirbelauer, or to the Wilgus Corporation for the benefit of Wirbelauer; and I shall advise that an equity receiver be appointed for the Wilgus Corporation to protect and preserve Wiley's thirty-three and one-third per cent. of the profits *Page 398 
of the joint adventure which I find was entered into between him and Wirbelauer; and also that the defendants make a true and full discovery and disclosure of the profits, stocks, bonds, securities and cash which they, or either of them, received from Axelrod, and that the said joint adventure existing between the complainant and the defendant Wirbelauer be dissolved, in that an accounting be made of the profits accruing from the said joint adventure, and that a writ of ne exeat shall issue restraining the defendant Wirbelauer from departing the jurisdiction of the court.