[Civ. No. 1981. Third Appellate District.—August 25, 1919.]

## A. V. KEYES, Respondent, v. F. B. NIMS, Appellant.

[1] APPEAL — REVIEW OF FINDINGS BY APPELLATE COURT — EVIDENCE CONSIDERED.—In determining whether the findings of the trial court are supported, the appellate court is required only to look to the testimony presented by the prevailing party and, if sufficient, it may disregard any adverse showing made by the other party.

[2] JOINT ADVENTURES—PARTNERSHIP DISTINGUISHED.—While a partnership is ordinarily formed for the transaction of a general business of a particular kind, a joint adventure relates to a single transaction, although the latter may comprehend a business to be continued for a period of years. In a partnership, each partner embraces the character of both principal and agent, being the former when he acts for himself in the partnership; while in a joint adventure, no one of the parties thereto can bind the joint adventure.

[3] ID.—RIGHTS OF ADVENTURERS—RULES GOVERNED BY.—In an action to secure the dissolution of an alleged partnership between the parties and for an accounting, it is immaterial whether the relation between the parties is that of a partnership or a joint adventure, or a limited partnership. The resemblance between a partnership and a joint adventure is so close that the rights as between adventurers are governed practically by the same rules that govern partnerships.

---

2. Partnership distinguished from joint adventure, note, 115 **Am. St. Rep.** 407.

43 Cal. App.—1     (1)

[4] ID.—RIGHT OF MEMBERS TO SUE AT LAW.—One party to a joint adventure may sue the other at law for a breach of the contract or a share of the profits or losses or a contribution for advances made in excess of his share, as where the adventure has been closed and a party thereto is entitled to a sum certain as his share of the adventure, but the right thus to sue at law does not preclude a suit in equity for an accounting.

[5] ID.—ACTION FOR DISSOLUTION AND ACCOUNTING — PARTNERSHIP PLEADED—RELIEF GRANTED.—Where, in an action by a joint adventurer for a dissolution of an alleged partnership and for an accounting, the evidence is sufficient to warrant the trial court in finding and adjudging that the plaintiff is entitled to one-third of the profits realized from the joint enterprise which was the subject of the agreement between him and the defendant and to an accounting for the purposes of determining the extent or amount of such profits, such judgment and decree will be sustained on appeal notwithstanding the complaint alleges that the relation between the parties was a partnership whereas it was a joint adventure.

[6] ID.—EFFECT OF CONTRACT TAKING IN NEW PARTY.—Where two persons enter into a partnership agreement for the purpose of carrying on a certain designated business, but subsequently a third person, with the consent of the two original members, is given a one-sixth interest in the partnership by each of such members, the purpose of the partnership not being changed, the taking of such third person into such partnership does not constitute the making of such an agreement as would operate to supersede and abrogate the original agreement between the parties thereto.

[7] APPEAL — QUESTION NOT CONSIDERED THROUGH OVERSIGHT — REHEARING NOT NECESSARY.—Where the appellate court, through oversight, fails to consider the question of interest allowed by the trial court, such matter may be considered and disposed of on application for a rehearing without ordering a rehearing. (On petition for rehearing.)

[8] JOINT ADVENTURES—ACTION FOR DISSOLUTION AND ACCOUNTING—RIGHT OF PLAINTIFF TO INTEREST.—In an action by one party to a joint adventure for a dissolution of the relationship between the parties and for an accounting, it is not error to include in the judgment interest on the amount of money awarded to the plaintiff from the date of the sale of the subject matter of the ad-

---

4. Mutual rights and liabilities of parties to joint adventure, notes, 17 Ann. Cas. 1022; Ann. Cas. 1912C, 202; Ann. Cas. 1914C, 691; Ann. Cas. 1916A, 1210.

8. Settlement of accounts between joint adventurers, note, **Ann. Cas.** 1912C, 204.

venture by the defendant, where the only question to be determined by the court is the extent of the plaintiff's interest, that is, whether it is a one-half or a one-third interest, the facts governing which are known to the defendant. (On petition for rehearing.)

APPEAL from a judgment of the Superior Court of San Joaquin County. George F. Buck, Judge. Affirmed.

Meredith, Landis & Chester, Thos. S. Louttit, Gerald Beatty Wallace, Webster, Webster & Blewett and Louttit & Stewart for Appellant.

Lafayette J. Smallpage and Scott Rex for Respondent.

HART, J.—The action was brought to secure the dissolution of an alleged partnership between the parties and for an accounting. A trial was had before the court sitting without a jury and judgment was entered dissolving the partnership and awarding plaintiff damages, with interest and costs, amounting in the aggregate to $6,960. The appeal is by defendant from said judgment.

Appellant contends that the evidence is insufficient to support several of the findings of the court, the first finding attacked being numbered 1, which stated that the parties hereto "formed a partnership."

The finding that the relation existing between the parties was that of a partnership was based upon a written instrument (hereinafter to be called the "Keyes-Nims contract") which is in the following language:

"Stockton, California, September 26th, 1916.

"It is hereby agreed between F. B. Nims of Stockton, California, and A. V. Keyes of Stockton, California, that all dealings and contracts entered into with the Samson Sieve-Grip Tractor Company of Stockton, California, after the 27th day of September, 1916, that each shall have an equal interest, that is, share and share alike.

"F. B. NIMS.
"A. V. KEYES."

It is argued by appellant that the above agreement did not contain the essential elements of a partnership agreement, and that the parties, at the time of the signing thereof, did not intend to become partners. It is also contended by ap-

pellant that the said Keyes-Nims contract was never acted upon so as to "launch" a partnership. The above propositions will be considered in their order.

The consideration of the points thus relied upon by appellant will be clarified by first presenting a brief statement of the facts leading up to the execution of the said instrument and of the subsequent dealings between the parties.

The plaintiff testified that he had been engaged for about ten years in the business of selling investment securities and that, in 1916, he secured a contract from the Samson Sieve-Grip Tractor Company (hereinafter called the Samson Company), under the terms of which he was to endeavor to sell one hundred and fifty thousand dollars' worth of the capital stock of the company on a ten per cent commission basis. On September 20, 1916, plaintiff presented to defendant a "form" letter of introduction from J. M. Kroyer, president of the Samson Company, and endeavored to interest defendant in the purchase of stock. Plaintiff had previously suggested to Mr. Kroyer the advisability of establishing a manufacturing plant in the middle west. In the course of the conversation with defendant, plaintiff mentioned the matter of building a factory in the middle west. Defendant said that he had just returned from Michigan and that he had a friend there who was desirous of entering into a contract for the agency of some tractor company. Plaintiff testified: "I told Mr. Nims at this time, 'Mr. Nims, I feel that I can get a contract from the Samson Company if I had some man with me who was financially responsible,' that I knew that the Samson Company would not give me a contract because I did not have the means to carry out the idea that I had, and asked him if he was . . . and he said that he was, that he would go as strong as forty thousand dollars." Plaintiff said that defendant requested him to take the matter up with the Samson people, which he did, with the result that, on September 26, 1916, the Samson Company addressed to plaintiff a letter in which it was stated that at a directors' meeting it was decided to enter into such an agreement if satisfactory arrangements could be made. The letter also made tentative proposals for the execution of a contract. Plaintiff immediately submitted this letter to defendant, its terms were discussed and defendant suggested that plaintiff write a counter-proposal, which he did. During this conversation

plaintiff said: "Mr. Nims, would you mind signing some kind of a simple agreement that in case anything happened to us, you having the contract in your name as we have discussed it, I will have something to show that I have an interest therein?" Defendant replied: "Certainly." Plaintiff prepared the Keyes-Nims contract and it was signed by defendant. The witness testified that in several conversations he had with defendant they had talked generally about how the matter should be financed. He testified: "I stated to Mr. Nims that I didn't have money enough at that time hardly to pay the expenses incurred in the sale of this stock, and that I would have to wait before I could put in any money until such time as I had sold that stock and derived the commissions therefrom." Plaintiff showed defendant a copy of his commission contract with the Samson Company and witness stated that defendant said "that he was willing to finance me until such time as I got in returns from the sale of this stock."

A contract between the Samson Company and defendant was drawn up and plaintiff said he had four or five interviews with defendant in which its terms were discussed by them. The contract was executed on October 23, 1916. By its terms defendant was given the right to erect one or more plants and to sell tractors in certain designated territory in the United States and Canada. Certain payments by defendant to the company were specified, the first being two thousand five hundred dollars to be paid upon the signing of the contract.

Plaintiff testified that, about the 15th of October, 1916, defendant said to him that he, defendant, had a friend, of the name of Mr. Clarke, whom he had taken the liberty to invite into the proposition. Two or three days later a meeting was held at the Hotel Stockton at which were present plaintiff, defendant, and C. D. Clarke. As to what then occurred plaintiff testified: "There was a general discussion regarding different methods that we should finance this company in the middle west, and Mr. Nims told Mr. Clarke, in so many words, that I would receive from the sale of the stock of the Samson Company something over ten thousand dollars; . . . I had a ten per cent contract to sell one hundred and fifty thousand dollars' worth of stock. I replied that was true, and followed that up by stating that I would

be perfectly willing, when that stock was sold and I would re-
ceive my money from it, to put in any amount that would be
agreed upon by us gentlemen at a later date, five or ten
thousand dollars. . . . Mr. Nims stated to Mr. Clarke that
he had to take care of me until such time as I sold the
stock . . . Mr. Clarke suggested that he would come in with
us and put up his third and send a check in a few days.  Mr.
Nims said, 'Well, boys, I am going through with it anyway.'
Mr. Clarke says, 'Be assured in a few days I am going to
come in.' . . . During this conversation no mention was made
of the contract between Mr. Nims and myself.''

It further appears, and the court found, that on or about
October 17, 1916, and prior to the obtaining of the royalty
contract from the Samson Sieve-Grip Tractor Company, the
plaintiff and defendant, by mutual consent, both offered to
C. D. Clarke one-sixth of their respective interests, that said
Clarke accepted said offer, and that thereupon the interests
of said partnership and its assets of said Clarke, plaintiff
and defendant were equal, each acquiring a one-third thereof;
"that, during the month of January, 1917, defendant, without
the knowledge or consent of plaintiff, agreed to return to said
Clarke all moneys which he had theretofore advanced toward
the aforesaid partnership business, and in return therefor
the said Clarke agreed, without the knowledge or consent of
plaintiff, to assign to defendant his one-third interest in and
to said partnership and its assets''; that during the month of
April, 1917, the said agreement between said Clarke and the
defendant was consummated in accordance with the terms
thereof, and that thereupon the said Clarke ceased to have
any interest in said partnership or its assets.

On or about April 3, 1917, defendant sold to the Samson
Company his royalty contract with the company and received
the sum of twenty-two thousand five hundred dollars.  When
plaintiff learned of this fact he asked defendant what he was
"to get out of it," to which defendant replied, "You don't
get a thing."

Upon an accounting, subsequent to the trial, it was stipu-
lated that defendant received twenty-two thousand five hun-
dred dollars; he was credited with two thousand five hun-
dred dollars the payment made by him on account of the
contract, and $574.20, disbursements made by him, leaving
net proceeds in his hands of $19,425.80.  Plaintiff waived all

claims for expenses and disbursements made by him, and the judgment in his favor was for one-third of said $19,425.80.

It is proper to say and briefly to show herein that the defendant's version of the transaction between him and the plaintiff was, in material particulars, wholly at variance with that of the latter. The defendant testified that, at the time of the conference at the Hotel Stockton, it was understood that he and plaintiff owned the contract jointly. "I guess," he continued, "there is no question as to Mr. Keyes being a partner up to that time. Mr. Clarke understood it so, so did I." Referring to conversations leading up to the execution of the Keyes-Nims contract, witness said plaintiff told him "that he had a contract with the Samson Company by which he would make fifteen thousand dollars, and, outside of a thousand he wanted to pay on his house, he could put the entire balance into the business"; that as the expenses accrued each was to put in his share of the money. The witness said that he told plaintiff that Mr. Clarke was desirous of coming into the business; that plaintiff consented to Clarke coming in and "said we would divide it three ways, that we would each put up $833.33, which would have to be paid to the Samson Company within two or three days." As to the meeting at the Hotel Stockton, which defendant said was on October 17th, he testified: "It was discussed that we would raise a fund of either five or ten thousand dollars each as a nucleus upon which to start our new plant. Mr. Clarke said, 'Mr. Keyes, are you ready to put up this money?' Mr. Keyes says, 'Yes, I will put up my money right off, right away.' . . . I said, 'Whether either one of you go in or not, I have decided I am going to take on this contract.' Mr. Clarke said, 'Anyone who doesn't put up his money doesn't get in.' Mr. Keyes said that was agreeable to him. He sanctioned that." Clarke and defendant each paid $1,250 of the first payment of two thousand five hundred dollars to the Samson Company.

C. D. Clarke testified, regarding the meeting at the Hotel Stockton, as follows: "We discussed the financing of the contract with the Samson Company. I said, 'Boys, I am going to pay this money anyhow; I am going to take care of the contract.' And we each agreed to pay our share at once; that is to say, I agreed and Mr. Keyes agreed. I said, 'I will take one-third of it.' Mr. Keyes said he would pay one-

third of it. The matter of failure to pay was brought up and I said, 'Who fails drops out.' Mr. Keyes said, 'That is O. K.' '' The witness said that defendant did not say at the meeting that he would carry plaintiff for his share of the money that was to be paid upon the Samson Company contract.

[1] But, in determining whether the findings of the court are supported, we are required only to look to the testimony presented by the plaintiff and, if sufficient, we may disregard, in such consideration, any adverse showing made by the defendant. It cannot be doubted that the testimony of the plaintiff amply supports all the vital findings made by the trial court; hence, the following must be regarded and accepted as the established facts of the case: That the Keyes-Nims agreement, as given above, was made and entered into by and between the plaintiff and the defendant; that the intention of the parties, as expressed or contemplated by said agreement, was, according to an admission by the defendant, to enter into copartnership with respect to all dealings and contracts which they might have or enter into with the Samson Sieve-Grip Tractor Company, and that they were each to have an equal interest in such dealings and contracts; that, after the said agreement had been made, one Clarke was invited to enter as a third party into the agreement, and upon the consent of the plaintiff as well as that of the defendant did join the two latter in the proposed arrangement as a party thereto; that Clarke and the defendant advanced their respective proportions of the aggregate amount of money required to carry out the agreement, and that the defendant agreed to advance the plaintiff's part thereof upon the agreement and understanding that the plaintiff, upon receiving certain moneys he had in prospect, would repay the defendant the money so advanced for plaintiff.

The theory of the respondent, and the complaint proceeds upon that theory, is that the relation between the plaintiff and the defendant as produced by the agreement was that of a partnership; and the court below so decided. Counsel further contends, however, that if, strictly, the relation so produced was not that of a partnership, it certainly was that of a joint adventure.

It is obvious that the agreement, as originally formed, contemplated that there should be a division between the plain-

tiff and the defendant of the profits derived from the business or enterprise in which they agreed to jointly engage, and to this extent the relation created between them by the agreement bears the earmarks of a partnership, which, as defined by our Code, is an "association of two or more persons for the purpose of carrying on business together, and dividing its profits between them." (Civ. Code, sec. 2395.) On the other hand, the agreement related to a single transaction, viz., the procurement of a contract from the Samson Company whereby the plaintiff and defendant would be permitted and authorized to erect one or more plants and to sell said company's tractors in certain designated territory in the United States and Canada, the plaintiff and the defendant, as seen, to share equally in said contract and the profits accruing therefrom. [2] It is said by the authorities that one of the distinctions differentiating a partnership from a joint adventure lies in the fact that, while a partnership is ordinarily formed for the transaction of a general business of a particular kind, a joint adventure relates to a single transaction, although the latter may comprehend a business to be continued for a period of years. It is also said that another feature distinguishing a partnership from a joint adventure is the fact that a corporation incapable of becoming a partner may bind itself by contract for a joint adventure, the purposes of which are within those of the corporation. (23 Cyc., p. 453.) There are other features which differentiate the two relations, among which may be mentioned the element of principal and agent which inheres in the partnership relation, each partner embracing the character both of a principal and agent, being the former when he acts for himself in the partnership. (Story on Partnership, sec. 1; *Jackson* v. *Hooper,* 76 N. J. Eq. 185, [74 Atl. 130, 135].) In a joint adventure, no one of the parties thereto can bind the joint adventure.

[3] But there is a considerable amount of law upon this subject, the discussion of which here may well be regarded as academic, since it is a matter of absolutely no consequence, so far as the decision of this case is concerned, whether the relation created between the parties to this action is that of a partnership or a joint adventure, or a limited partnership, which we are inclined to believe it to be; for it is held by the cases that the resemblance between a partnership and a joint adventure is so close that the rights as between adven-

turers are governed practically by the same rules that govern partnerships. (15 Ruling Case Law, p. 500.) Accordingly, a joint adventurer, as a partner in a partnership may do, may sue in equity for an accounting of the profits flowing from the joint adventure. [4] It is true that one party in a joint adventure may sue the other at law for a breach of the contract or a share of the profits or losses or a contribution for advances made in excess of his share, as where the adventure has been closed and a party thereto is entitled to a sum certain as his share of the adventure, but the right thus to sue at law does not preclude a suit in equity for an accounting. (15 Ruling Case Law, p. 507.)

[5] The complaint here proceeds, as we have stated, upon the theory that the agreement between the parties involved the establishment of a partnership relation, and the court's decision was according to that theory, the interlocutory judgment decreeing a dissolution of "said partnership," that plaintiff is entitled to one-third of the net profits realized from "said partnership business," and that plaintiff have an accounting of said "partnership business" to determine the amount of said net profits, etc. Conceding that it is difficult to determine with accuracy from the pleaded facts and the evidence, or the agreement itself, whether the relation created by said agreement was a partnership or a joint adventure relation, still it is, of course plain that either one or the other of those relations is thus disclosed, and, since the enforcement of the rights of the parties may be accomplished by or through the agency of remedies applicable and pertinent alike to both relations, it is, as above suggested, a matter of no consequence here whether the relation between the parties be that of a partnership or that of a joint adventure. An accounting and a termination of the relation in either case may be had in a proceeding appropriate to such relief in a court of equity (*Jackson* v. *Hooper, supra*), and, therefore, if we assume that the relation between the parties was that of a joint adventure rather than that of a partnership, the decree herein comes as clearly within the issues made by the pleadings as though the complaint had specifically alleged that the agreement was a joint adventure. It follows that, whether the relation between the parties was that of a partnership or that of a joint adventure, the evidence is, upon its face, sufficient to have warranted the

court below in finding and adjudging, as it did find and adjudge, that the plaintiff was entitled to one-third of the profits realized from the joint enterprise which was the subject of the agreement between him and the defendant and to an accounting for the purpose of determining the extent or amount of such profits.

The second point made by the appellant is that the original partnership, if such it was, whereby the plaintiff and the defendant associated themselves together for the purpose of securing the contract referred to in their written agreement was never "launched"—that is, the partnership as then formed at no time proceeded to or did carry out the purposes for which it was organized.

The position of appellant with respect to that proposition may perhaps the better be stated in the language of his brief, viz.: "In the case at bar, the terms of the two contracts were inconsistent. There were two parties to the Keyes-Nims agreement. There were three parties to the Clarke agreement. Nothing was said in the Keyes-Nims agreement as to what amount of money each of the parties was to advance, or when. A condition precedent to obtaining an interest in the Clarke agreement was the payment of $833.33 forthwith by each party who desired to 'come in.' Everything done by appellant in protecting the Samson contract, and subsequently disposing of said contract, was in pursuance of the Clarke agreement. After giving Keyes a reasonable time within which to advance his $833.33, as stipulated in the Clarke agreement, he no longer considered that Keyes had an interest in the project. If Keyes had intended to rely on the original Keyes-Nims agreement, he should have declined to accept the three-cornered proposition made at the conference at the Hotel Stockton on October 17, 1916."

This position involves an attack upon the findings that the interests of plaintiff and defendant in "such partnership, as originally formed," were equal, each being entitled to three-sixths interest, and that on or about October 17, 1916, and prior to the procurement of the royalty contract from the Samson Company, "plaintiff and defendant, by mutual consent, both offered to C. D. Clarke one-sixth of their respective interests"; that Clarke accepted said offer and that thereupon each of the parties to the agreement, plaintiff, defendant, and Clarke, owned a one-third interest "in said partner-

ship'' and its assets. It also involves the question whether there is a variance between the plaintiff's pleading and the proof—that is to say, whether the agreement declared upon by plaintiff is the agreement proved.

It is argued that, when Clarke was admitted into the partnership or association, upon the terms then agreed upon, viz., that each should contribute an equal amount to finance the concern, an entirely new contract was made which superseded and abrogated the original agreement between plaintiff and defendant; that Keyes having failed to pay his proportion of the amount which it was then agreed would be necessary to carry out the purpose of the association, he forfeited whatever rights he might have acquired in the new arrangement or agreement.

As has been shown, the plaintiff testified and the court found that when the agreement between him and the defendant was entered into it was agreed that he was to share equally in the profits, and that the defendant promised and agreed to advance for plaintiff his share of the expenses of the venture or partnership and also any other sums of money which might become due from plaintiff to the partnership, ''until such time as plaintiff would be financially able to reimburse defendant for such advances.'' The plaintiff testified, as seen, that such was also the understanding and agreement between him and defendant at the time Clarke was brought into the arrangement or agreement.

[6] It is clear that, so far as plaintiff's right to a share of the profits realized from the enterprise is concerned, it is immaterial whether it be true or not that the circumstance of admitting Clarke into the association or partnership worked a new agreement which superseded and abrogated the original agreement between Keyes and Nims. The original agreement by Nims that he would advance whatever sums of money that might become due to the partnership from Keyes was reaffirmed by him at the time Clarke entered into the agreement as a party thereto. Moreover, Clarke was admitted into the partnership, if such it was, upon the consent and agreement of the plaintiff as well as that of the defendant; hence, if it was a new agreement, it was one which was made by all the parties, including the plaintiff. But, if the effect of the original agreement was to create a partnership relation between Keyes and Nims, as we believe it was,

the fact of the taking of Clarke into such partnership did not constitute the making of such an agreement as would operate to supersede and abrogate the original agreement between Keyes and Nims.  The situation, upon Clarke entering the partnership, was simply this: That Keyes and Nims had entered into an agreement of partnership for carrying on a certain designated business, and before carrying out the purpose of the agreement, took into the partnership, already so established and formed, another party as a partner therein.  There was nothing in the terms of the so-called "new agreement" different from those of the agreement between Keyes and Nims, except that said parties disposed of certain of their interests to the new partner and entered into an understanding that each of the three should contribute equally to the financing of the enterprise, should share equally in the profits accruing therefrom, and bear equally the burdens thereof.  In fact, no more can be said of the effect of taking Clarke into the partnership than that it was either a qualification of the original agreement, to which Keyes as well as Nims actually subscribed, whereby another partner was taken in and the terms more definitely specified, or that it was merely an agreement subsidiary or ancillary to the original.

The cases cited by appellant are not in point here because the facts thereof are materially variant from those of this case.  For instance, in the case of *Black* v. *Hunter,* 169 Cal. 632, [147 Pac. 463], cited by appellant, the original agreement, which involved a combination or association of the parties thereto for the purpose of effectuating a sale of particular tracts of land to the county of Los Angeles, to be used by the county for the erection thereon of a hall of records, had been entirely abandoned by the parties after a futile effort by them to make a sale of the properties.  It appears that the parties to said agreement were one Hunter and the appellant Black, who, having learned that Rowan & Co., real estate brokers, had other lands which they were trying to sell to the county, to be used for the same purpose, took said Rowan & Co., in with them and made them parties to their agreement, the purpose being to put an end to the rival propositions of said brokers.  It was this agreement that was abandoned because of a failure to make the sale.  Subsequently Hunter and Rowan & Co. entered into a contract

whereby they agreed between themselves to secure the right to sell the same lands to the county and, if successful, to divide equally between themselves the commissions realized from the sale. The sale was effected by them, and they received the stipulated commissions, whereupon Black, who was not a party to the second agreement, brought suit to recover a share of the commissions, claiming that "the first contract was one of copartnership; that the second was not a substitution for it, but merely took Rowan & Co. into the transaction as an agent of the copartnership and, therefore, the cancellation of the second contract (and appellants admit that it is no longer in existence) did not abrogate the original agreement of copartnership." The supreme court, through Mr. Justice Melvin, held that the finding that the tripartite agreement had been terminated by the parties themselves and said agreement abandoned was fully sustained by the evidence. And, even if, as the appellant in that case contended, the original agreement had not been abrogated by the subsequent or tripartite agreement but was a part of the latter, the abandonment and cancellation of the tripartite agreement by all three parties thereto would necessarily have involved the abandonment and cancellation by said parties of the original agreement.

But be that as it may, in this case there was not an abandonment of the original agreement, by the acts of the parties themselves, as was true in the case above considered, nor was there any evidence or pretense that the agreement to which Clarke became a party was independent of any and all consideration of the original contract. Keyes had conceived and proposed the scheme to Nims, who, in writing, agreed with the former to enter upon its consummation with him upon the understanding that they should share equally in the profits resulting from it. Nims suggested to Keyes the advisability of "taking in Clarke," because the latter was able to assist in financing the proposed enterprise, and in taking him in, both Keyes and Nims acted with reference to, and in view of, the agreement between them as originally formed. They, in other words, merely brought Clarke into their agreement, as originally formed, as a party thereto with themselves. Indeed, there was nothing to take Clarke in on but the agreement, for the business itself to which the agree-

ment related had not been started or even the facilities for its operation obtained at that time.

The other cases cited by the appellant in their facts bear no nearer analogy to the instant case than does the case of *Black* v. *Hunter*, above considered. The principles discussed in those cases are therein soundly applied, but the facts to which they are therein applied are entirely different from those with which we are here confronted.

The judgment is affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on September 24, 1919, and the following opinion then rendered thereon:

HART, J.—In his petition for a rehearing the appellant calls our attention to the fact that, in our original opinion, we overlooked the proposition urged by him in the briefs that the court below erred in allowing the plaintiff interest on the latter's share of the amount for which the defendant sold the royalty contract with the Samson Company. [7] The failure to consider the question of interest was purely an oversight, and, as it is an important question herein, it should have been considered, but we do not see the necessity of granting a rehearing for that purpose, and we will, therefore, consider and dispose of the point on this application without ordering a rehearing.

Counsel for appellant take the position that the demand declared upon by the plaintiff was uncertain or unliquidated, and that, therefore, it was error to include in the judgment against appellant interest on the amount awarded the plaintiff from the date of the sale and the payment of the money to appellant, which was April 3, 1917. In support of this position there are cited many California cases, of which the leading ones are: *Cox* v. *McLaughlin*, 76 Cal. 60, [9 Am. St. Rep. 164, 18 Pac. 100]; *Easterbrook* v. *Farquharson*, 110 Cal. 311, [42 Pac. 811], and *Edwards* v. *Arp*, 173 Cal. 476, [160 Pac. 551].

The reason for the denial of interest on unliquidated demands is said to be "that the person liable does not know what sum he owes, and, therefore, can be in no default for not

paying." (*Cox* v. *McLaughlin, supra.*) But it is further said in that case: "We are not prepared to say, in general terms, that no interest in any case can be recovered in an action upon contract for an unliquidated demand. *Mix* v. *Miller*, 57 Cal. 356, decided since the adoption of the code, and *McFadden* v. *Crawford*, 39 Cal. 662, decided previously, attest the doctrine that in this state interest is allowable on such demands under some circumstances. These were cases in which the contract had been fully performed by the creditors, the fruits thereof accepted by the debtors, without objection, and they were clearly in default, and in the latter case *the only question was as to value.*" (Italics ours.) This language is approvingly adopted into the opinion in *Easterbrook* v. *Farquharson*, 110 Cal. 317, [42 Pac. 811], *supra.*

In the case of *Robinson* v. *American Fish Co.*, 17 Cal. App. 212, 220, [119 Pac. 388, 391], the defendant had agreed with the plaintiff and a number of assignors of the latter to purchase fish from them, to be delivered to the defendant in the city of San Francisco. Action was brought by plaintiff to recover the aggregate sum of $815.60, which amount represented the demands of the plaintiff and his several assignors for fish delivered by them to defendant. The court awarded judgment to plaintiff in the total sum sued for, together with interest thereon at the legal rate of seven per cent per annum from the date of the delivery of the fish. In that case, on appeal, it was strenuously insisted that the demands declared upon were unliquidated and that the trial court, therefore, erred in allowing interest from the date of the delivery of the fish. There was a dispute therein as to whether the price agreed upon for the fish was a cent and a half or two cents per pound. This court, disposing of the question of interest in that case, said:

"There is no merit in the contention that the plaintiff was not entitled to interest on the several pleaded claims from the twenty-third day of October, 1910—the day on which the fish mentioned in the complaint were sold and delivered to appellant. The quantity of fish sold to and received by appellant and the price to be paid therefor were definitely fixed and known to appellant. It was not necessary, in other words, to resort to evidence in court or to an accounting or by an accord between the parties to establish the amount due.

To the contrary, the amount was susceptible of ascertainment by simple computation. (*Cox* v. *McLaughlin,* 76 Cal. 60, [9 Am. St. Rep. 164, 18 Pac. 100], and cases therein cited; *Easterbrook* v. *Farquharson,* 110 Cal. 311, 317, [42 Pac. 811]; *Courtney* v. *Standard Box Co.,* 16 Cal. App. 600, [117 Pac. 778].) Indeed, there seems to have been no dispute as to the quantity of fish delivered to appellant by Meng, and while there was some controversy involving the price per pound which Junta agreed to pay therefor—that is, whether the price agreed upon was a cent and a half or two cents per pound—still the total amount due at either price was capable of ready ascertainment by mere computation, and, therefore, required no accounting to reach the precise sum due. As is said in *Courtney* v. *Standard Box Co.,* 16 Cal. App. 600, [117 Pac. 778], so it is true here: 'Whether interest has been allowed upon the theory that compensation is thus awarded plaintiff for the use of his money, past due (Civ. Code, sec. 1917), or as damages for defendant's (appellant's) wrongful withholding of said money from plaintiff (Civ. Code, sec. 3287), in either case the allowance was perfectly proper.' " (We also call special attention to the Courtney case, cited above in the Robinson case.) It should be stated that a petition for a hearing of the Robinson case by the supreme court after judgment by this court was denied.

The comparatively recent case of *Howard* v. *Hobson Co.,* 38 Cal. App. 445, [176 Pac. 715], was an action by one broker against another to recover one-half of the amount in excess of that for which certain real estate was to be sold for the owner, an agreement having been entered into by and between the brokers whereby they were to divide equally between themselves such excess amount. Judgment went for the plaintiff, with legal interest from the date of the sale of the property by the other broker. The evidence disclosed that the expenses incident to the negotiation and consummation of the sale of the property were to be deducted from the amount which the brokers were to receive as their compensation for effecting the sale. The contention on appeal in that case as to interest was, among other objections urged against the allowance of interest, that the demand sued on was unliquidated, and that, consequently, interest was not allowable prior to the date of the entry of judgment. That contention was rejected, and, among other things, this court said:

"As above stated, the moment that the sale of the ranch was fully effected and completed by the defendant, that moment the latter became indebted to the plaintiff in an amount equal to one-half of the net sum received by the defendant over and above that paid for the property to the owner of the ranch; and at that moment of time the amount due the plaintiff became certain and definite or capable of becoming readily so by the simplest of arithmetical calculation by the defendant of the difference between the 'excess amount' and the amount of the expense which it was necessary for it to incur to negotiate and consummate the sale. The defendant, of course, knew precisely what the expense of selling the ranch amounted to, and, of course, knew the 'excess amount' received, by him from the sale over the purchase price. The amount due the plaintiff, therefore, constituted, within the meaning of the law, a liquidated demand.'' The supreme court, it should be remarked, denied a hearing in that case after judgment in this court.

[8] In the present case the defendant, according to the findings, which are sufficiently supported, became indebted to the plaintiff in the sum to which the latter was entitled as a partner the moment that he (defendant) sold the royalty contract and received the money therefor. The plaintiff, it is true, sued for one-half of the amount received by the defendant for the royalty contract, while the court awarded him one-third of the amount only. But this did not make the demand uncertain or unliquidated. The defendant, it appears, at all times had control and management of the enterprise. He knew whether Clarke had or had not paid over his share of the amount agreed upon as the necessary total amount to launch the enterprise. The plaintiff appears to have had very little knowledge of what was going on in the prosecution of the ends of the copartnership, and it is probable, having heard that Clarke had withdrawn from the concern, that he sued on the theory that Clarke had never paid over his share of the working capital of the firm, and was, therefore, as a matter of fact, never a partner, and hence conceived that he was entitled to one-half of the profits of the enterprise, or of the amount for which the defendant sold the royalty contract. But, whether the defendant was entitled to one-half of the amount received for the royalty contract or to one-third only is entirely immaterial, so far as

the question of interest is concerned. The defendant knew, as we may assume from the findings, that the plaintiff had an interest in the partnership. What that interest was was a disputed question between them, but it was either a one-half or a one-third interest. As to this, then, the only question to be determined was as to the extent of the plaintiff's interest. Whether it was found to be one-half or only one-third, in either case the demand was certain, definite, and liquidated.

The cases holding that interest is not allowable is where the demand is based upon a *quantum valebat* or a *quantum meruit*, in which it must be determined upon the evidence what the amount is, or where the amount of the demand must be determined by an accounting or by an examination of numerous accounts and counterclaims. This is not such a case, as we have shown. As stated, the amount of the demand here was ascertainable by a mere determination of the question whether the plaintiff's interest was one-half or only one-third in the partnership, and the defendant himself, if he knew the plaintiff had any interest at all, knew whether it was the one or the other. Therefore, when we consider the reason upon which is founded the rule that, generally speaking, interest will not be allowed on an unliquidated demand prior to the date of the entry of judgment therefor, viz., "that the person liable does not know what sum he owes, and therefore can be in no default for not paying," we readily perceive that the demand sued on here does not come within that rule —that is, that it is not unliquidated in the sense that interest is not payable upon it from the date the money was received by defendant.

The case of *Easterbrook* v. *Farquharson, supra,* cited by the appellant, was where the plaintiff leased to the defendant's assignor certain real property, upon which the lessor was to and did erect a building, under an agreement that on the last day of the term of the lease the lessor would pay the lessee two-thirds of the appraised value of the building, to be ascertained by three appraisers, one of whom was to be selected by the lessor, one by the lessee, and the third by the two so selected. The two appraisers appointed by the parties failed to select a third, and themselves failed to agree upon the value of the building. Some six months thereafter, nothing further having been done in the matter of the appraisement

of the value of the building, although the lessor and lessee in the meantime had considerable negotiations looking to an adjustment of the matter, the lessor brought suit, setting forth the facts and the impracticability of securing an appraisement by the scheme agreed upon by him and the lessee, averring his readiness at all times to pay the defendant (lessee) two-thirds of the cash value of the building, and asking the court to determine the value of the building at the date of the termination of the lease, and so fix the amount due from him to defendant. The trial court found the value of the building, and, while in its findings it did not fix upon the plaintiff or his appraiser the responsibility for failure to agree upon an appraisement, nevertheless allowed interest on the amount found to represent the value of the building from the date of the termination of the lease. The supreme court held that the allowance of interest from the date of the termination of the lease was erroneous, and said: "To entitle respondent to interest as damages he must bring himself within the terms of section 3287 of the Civil Code. That section awards interest to every person who is entitled to recover damages, certain, or capable of being made certain, by calculation, where the right of recovery is vested in him upon a particular day. But damages are the compensation for the unlawful act or omission of another (Civ. Code, sec. 3281), and, as has been said, appellant had been guilty of no wrong. He went into court asking a settlement of his account with respondent, and under section 1917 of the Civil Code the sum bore interest only from the day of its judicial ascertainment."

It is plainly manifest that the above case is not in point here, and is no authority against the allowance of interest in the present case from the date the right of recovery was vested in the plaintiff, which was the time when the defendant received the money for the royalty contract.

It is not necessary to review the case of *Edwards* v. *Arp,* 173 Cal. 476, [160 Pac. 551], *supra,* also cited by appellant in the petition, it being only necessary to say that in its facts it presents an entirely different situation upon the question of interest from that we find here.

The appellant further asks in his petition that the case be reopened for a further review of questions considered in the original opinion. We are satisfied with the views expressed and the conclusion announced in the former opinion as to the

legal nature of the agreement between the parties hereto and the effect of making Clarke a party to said contract. We may repeat, though, what we have already said, that we do not consider that the contract sued on is at variance with the one proved. The fact merely is, according to the result reached by the trial court from the proofs, that the plaintiff sued upon the theory that he had a larger interest in the partnership than he in fact was entitled to. Thus the situation is the same as where a party sues for a certain sum alleged to be due under a contract with the defendant, but the proof shows that he is entitled to judgment for a less sum than that demanded by his complaint. Such a result, of course, does not mean that the plaintiff sued on one contract and proved and recovered on another.

The petition for a rehearing is *denied.*

Chipman, P. J., and Burnett, J., concurred.