[Civ. No. 5405.   Fourth Dist.   Sept. 6, 1956.]

RICHARDS REALTY COMPANY (a Copartnership) et al.,
Petitioners; MARION SANDS RICHARDS, Appellant,
v. THE REAL ESTATE COMMISSIONER, Respondent.

Thomas J. Burke for Appellant.

Edmund G. Brown, Attorney General, and Lee B. Stanton,
Deputy Attorney General, for Respondent.

BURCH, J. pro tem.*—This appeal is from a judgment
of the superior court in proceedings in mandamus to test the
validity of an order of the Real Estate Commissioner of the
State of California suspending the real estate broker's license
of petitioner, Marion Richards, for a period of 90 days.  The
order was made by the commissioner because of Richards'
conduct while a licensee in a transaction with regard to real
estate owned by Mr. and Mrs. Leaman.  An alternative writ

*Assigned by Chairman of Judicial Council.

was issued by the superior court, the commissioner answered, a full transcript of the testimony had before the commissioner was presented, the matter was argued and the court denied a peremptory writ. Upon consideration, the court made its findings, which coincide with those previously made by the commissioner, and judgment was entered against the petitioner and in favor of the commissioner. The peremptory writ was denied.

In the accusation before the commissioner the petitioner was charged with violating sections 10176, subdivision (g), and 10177, subdivision (f), of the Business and Professions Code in dishonestly gaining a secret profit when acting as an agent for Rex and Margaret Leaman to sell their real estate located at 616 Olivewood Terrace in San Diego, and converting the same to his own uses without account to the Leamans.

Section 10176, subdivision (g), authorizes the commissioner to temporarily suspend the license of a licensed real estate broker who obtains ''any secret or undisclosed amount of compensation, commission or profit'' or fails ''to reveal to that employer . . . the full amount of such licensee's compensation, commission or profit under any agreement authorizing or employing such licensee to do any acts for which a license is required under this chapter for compensation or commission prior to or coincident with the signing of an agreement evidencing the meeting of the minds of the contracting parties, regardless of the form of such agreement, whether evidenced by documents in an escrow or by any other or different procedure.'' Section 10177, subdivision (f), authorizes the Real Estate Commissioner to suspend a real estate broker's license who: ''(f) Acted or conducted himself in a manner which would have warranted the denial of his application for a real estate license.''

The question for the trial court was the sufficiency of the evidence to warrant the order of suspension under either subsection. The appellant makes the point on appeal that there was no substantial evidence and no sufficient evidence before the commissioner or before the court (the evidence was the same before both) to justify the commissioner's order of suspension or the court's finding that a fiduciary relation existed when Marion Richards obtained title to his clients' property and sold it at a profit and failed to account therefor. If this contention be correct, the peremptory writ should issue under the provisions of section 1094.5 of the Code of Civil Procedure. If, on the other hand, substantial evidence was introduced sufficient to support the essential findings, the

judgment must be affirmed. Under the provisions of that section, the court's inquiry in cases such as this extends "to the questions whether . . . there was any prejudicial abuse of discretion. Abuse of discretion is established if . . . the findings are not supported by the evidence (§ 1094.5, subd. (b)). Abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (*Moran* v. *Board of Medical Examiners,* 32 Cal. 2d 301, 308 [196 P.2d 20].) ▮ Under the authority of the Moran case and because the commissioner exercises state-wide jurisdiction, the court below was "authorized by law to exercise its independent judgment on the evidence." Further, the Moran case quotes with approval from *Hohreiter* v. *Garrison,* 81 Cal.App.2d 384, 402 [184 P.2d 323]: " 'Thus, the ultimate power of decision rests with the trial court.' " Before we examine the sufficiency of the evidence, we restate a well established rule of appellate jurisdiction as stated in *Tufts* v. *Mann,* 116 Cal.App. 170, 175 [2 P.2d 500], cited and relied upon for another purpose by appellant. After setting out the evidence for and that against the finding at some length, the court says: "However, it is not necessary to quote further, as it is apparent from the quotation already made, that there is evidence in the record to sustain the finding in question. A finding made by the trial court on conflicting evidence will not be disturbed if, as in this case, there is evidence to sustain the same. (*Fogg* v. *Perris Irr. Dist.,* 154 Cal. 209 [97 P. 316]; *Keyes* v. *Nims,* 43 Cal.App. 1 [184 P. 695].)" This rule is applicable here and " 'Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain the finding should resolve that doubt in favor of the finding.' " (*Moran* v. *Board of Medical Examiners, supra,* quoted therein from *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].) With these principles in mind, we examine the record for substantial evidence, whether or not it is contradicted, which supports the finding of which appellant complains.

Rex Franklin Leaman testified that on May 22, 1953, he executed a purchase and sale contract whereby the Leamans agreed to sell to Clyde M. Richards their real property known as 616 Olivewood Terrace, San Diego, for $5,800 net, or more. This agreement was signed "Clyde M. Richards, purchaser and Richards Realty Company, by M. S. Richards, agent." That theretofore he had told Marion Richards of information Leaman had acquired from the Veterans' Administration that

to get a state loan with which to purchase other property he wanted to buy he would have to sell the Olivewood Terrace property he then owned. He asked Mr. Richards if there was "some way I could get the deed out of my name so that I could go ahead and have them put the loan through, and he said it couldn't be done that way, but that he would take the property and give me so much cash . . . and then we finally made an agreement at $5,800 until the time he sold the property, and if he sold the property for so much, whatever was over and above his commission that I was to receive." At that time petitioner drew the purchase and sale agreement. Subsequently, the property in question was sold for $7,500. "Well, I asked him how much he received for it and he told me it was $7,500 and I asked him if I had anything coming, and he says no, he didn't believe I was entitled to any. He says he received somewhere around $300 over and above his commission that was clear, but that he didn't believe I was entitled to that because he said he went to extra work to sell the property and everything." "He says that he had to go to different places to borrow the money which he gave me in the first place." "He told me that he had spent about $100 for repairs on the property." Neither the Richards Realty Company nor anyone in their behalf made any accounting to the witness.

.On cross-examination Mr. Leaman testified that he had known the Richards Realty Company since 1946; that he had had loans from them "a time or two"; that Marion Richards had gone on Leaman's note and that Leaman was making regular payments to the office; that he was "fairly good friends with Marion Richards; that they had talked together many times about the sale of the property over the years." Mr. Leaman is an ex-service man and wanted to get a state veteran's loan. "He advanced me money on it (the property) until such time as he did sell it, and transferred the deed into his name." "Well, this agreement was drawn up, you know, that for $5,800 net or more. Now, Mr. Richards told me himself that he received $300 over and above his commission. Now, at the time this agreement was drawn up I was to receive that, and when I went in to see him later, he said I wasn't entitled to it." "Well, like I say, I just came from the Veterans' Administration, and the piece of property that I had intentions to purchase had been appraised . . . I am not sure . . . but they had told me that I had to sell this property before I could have any loan put through. Now, as

I told this to Mr. Richards and asked him if I could transfer that deed into my brother's name until such time as it was sold. He said it was against the law, that he couldn't do it, but that he would take the property and pay me so much for it then . . . He offered me $5,500 for it. I says no, I couldn't accept that . . . he says, 'Talk it over with your wife and see about it.' My wife says about $6,000. So I went back and talked to Mr. Richards again and he said that he didn't know exactly what he could get out of the property but he would give me $5,800 now, and at the time that the property was sold if he received more than what his commission was, the difference between that, that I was to receive then and he drew up the agreement right then.''

Mr. Richards explained that he wrote up the agreement. With respect to the words ''or more'' which he inserted in the clause stating the purchase price as ''$5,800 or more'' that he intended if he resold the property he would, as a friend, share the profit above purchase price and costs of sale and carrying charge; that ''In order to show the world, in case something happened to me, and because it was a friendly gesture, I placed in the deposit receipt two words: 'or more,' because he was certain that the property would sell for more than what I thought it would. But at no time did I ever tell him that I was going to give him all the profit on the property over what my commission would have been had I sold it for him . . . That meant that if I got a real good price for the property and did not have to discount the trust deed for cash to a private party, that I wanted him to have some extra compensation out of the property, and that is all that it meant.'' ''About four days after he delivered me the key, I was fortunate enough to resell the property to a John L. Sarabia for . . . $7,500.''

There was evidence from Mrs. Jones, who was the bookkeeper and who was present when the conversation took place. She spoke of hearing Mr. Leaman ask for $5,800 and say the property was worth some $8,000 or $8,500 and he expected when Marion sold the property to realize more. There was also evidence that Richards expected at a continued hearing that Leaman would repudiate his former testimony in certain respects but this expectation did not materialize beyond writing a letter hoping that his friend Richards would not suffer the suspension of his license.

Thus, the triers of fact in court and before the administrative body were confronted with the fact established, that the

transfer involved more than appeared from the written agreement or the deed. The conflict was only as to what that unwritten contingency was in fact. Leaman's version is corroborated by various testimony that the two had been close friends for years; that for years he had known the property was for sale and that as a friend and broker he had taken some measures looking to its sale; that Marion himself· drew up the agreement and omitted its full terms; that Marion's advice was sought by Leaman as to a legal method to obtain a veteran's loan and that the plan adopted to that end was not the ordinary transaction between buyer and seller, the deed to the contrary notwithstanding.

"The real estate broker is brought by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. We know from our judicial records that the opportunities have not been lost . . . He is accredited by his calling in the minds of the inexperienced . . . with a knowledge greater than their own." (Cardoza, J. in *Roman* v. *Lobe,* 243 N. Y. 51 [152 N.E. 461, 50 A.L.R. 1329].)

▬▬ A different question would be here if Leaman and Richards had been dealing at arm's length and not as friends over many years, one of whom was in a position to give advice to the other by reason of his experience and calling. It is true that Leaman was willing to sell but Richard's testimony shows Leaman did not want to sell at the price of $5,800. Judged by the common standards incident to their relations it is reasonable to infer that Richards promised Leaman his good offices to effect a profitable sale for Leaman and gain his proper commission for the service. It is clear that the court's finding has substantial support from the evidence. There can be no revision in this court unless the choice is clearly wrong. We conclude it is the more reasonable of the two possible inferences. The court had to resolve the conflict.

Petitioner refers to *Tufts* v. *Mann,* 116 Cal.App. 170, *supra,* as authority for his contention that a relation of vendor and purchaser and not one of agency exists between Leaman and Richards. In that case plaintiff and defendant were both employed in a real estate firm. They entered upon a joint venture to buy and sell at a profit the Fedora Hotel in Los Angeles owned by one Macklin. To that end plaintiff obtained from Macklin an option, under which defendant reported a sale ostensibly showing a profit of $2,500 which the parties divided after paying one-third to their employer by way of broker's

commission. Defendant was in fact the purchaser of one-half interest unknown to plaintiff. Defendant on a resale made a profit for himself of $6,729.20 and the value of an undivided half interest in other real property. Plaintiff brought suit and recovered judgment for his one-half share of the defendant's gain on resale. In affirming the judgment, the court construed the agreement to constitute the parties joint venturers rather than partners. The transaction was effected by a deed from Macklin to defendant's dummy purchaser. Going behind the form to the substance of the transaction, it was held that the joint venturers were purchasers from Macklin and sellers to the dummy. So in the case at hand, the court penetrated the form—the agreement of sale and deed—to arrive at the substance, to wit, an agency relationship.

The judgment is affirmed.

Griffin, Acting P. J., and Mussell, J., concurred.