**CRAY, McFAWN & CO. v. HEGARTY, CONROY & CO., Inc., et al.**

District Court, S. D. New York.
April 5, 1939.

Holthusen & Pinkham, of New York City (Spencer Pinkham, William F. Purcell, and Charles E. Oberle, all of New York City, of counsel), for plaintiff.

Mack, McCauley, Spiegelberg & Gallagher, of New York City (George A. Spiegelberg, of New York City, of counsel), for defendant Hegarty, Conroy & Co., Inc.

Simpson, Thacher & Bartlett, of New York City (Louis Connick, of New York City, of counsel), for defendant Atlas Corporation.

WOOLSEY, District Judge.

My judgment in this cause is that the complaint should be dismissed as against both defendants with costs, which will include all taxable disbursements and allowances.

I. A. My subject matter jurisdiction herein is based on diversity of citizenship.

The plaintiff, Cray, McFawn & Company, is a corporation of Michigan, engaged in the business of the purchase and sale of corporate securities.

The defendant Hegarty, Conroy & Co., Inc., hereinafter often referred to as Hegarty, is a corporation of the State of New York, also engaged in that business.

The defendant Atlas Corporation, hereinafter often referred to as Atlas, is a corporation of the State of Delaware, with its principal business office in Jersey City, New Jersey, and is what is known as an investment trust.

B. This suit was originally brought in the Supreme Court of New York County, but was removed thence to this Court by Atlas on a petition claiming that there was diversity of citizenship between it, as a Delaware corporation, and the plaintiff, as

a Michigan corporation, and that the suit as against it involved a controversy separable from the controversy between the plaintiff and Hegarty.

The circumstances surrounding the removal—which were somewhat out of the ordinary—are given in detail in the decision of the Circuit Court of Appeals for this Circuit approving the removal, on an appeal by the plaintiff from an injunction, which had been granted to Atlas by this Court to stop further proceedings in the State Court after the removal petition had been filed here. Cray, McFawn & Co. v. Hegarty, Conroy & Co., Inc., et al., 2 Cir., 85 F.2d 516.

C. My jurisdiction in this cause, being based on diversity of citizenship, comes within the ambit of the principles laid down in the decision of the United States Supreme Court in Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, and, because of the somewhat granulated jurisprudence which is the almost inevitable result of our federal system, and of the fact that this cause involves transactions in more than one state, some questions of conflict of laws are involved in it.

But this does not mean that any state law which may have to be considered must —as the plaintiff seems to imply in its brief —be proved as a fact in this court.

For the accepted rule almost since the beginning of our federal jurisprudence has been that the law of any State of the Union, whether statutory or the result of judicial decisions, is a matter of which the courts of the United States may take judicial notice without plea or proof, because the laws of the several states cannot in courts of the United States properly be regarded as foreign laws. Owings v. Hull, 9 Pet. 607, 625, 9 L.Ed. 246; Pennington v. Gibson, 16 How. 65, 81, 14 L.Ed. 847; United States v. Turner, 11 How. 663, 667, 13 L.Ed. 857; Covington Draw Bridge Co. v. Shepherd, 20 How. 227, 234, 15 L.Ed. 896; Cheever v. Wilson, 9 Wall. 108, 121, 19 L.Ed. 604; Brown v. Piper, 91 U.S. 37, 42, 23 L.Ed. 200; Elwood v. Flannigan, 104 U.S. 562, 568, 26 L.Ed. 842; Lamar v. Micou, 114 U.S. 218, 223, 58 S.Ct. 857, 29 L.Ed. 94; Roberts v. Reilly, 116 U.S. 80, 96, 6 S.Ct. 291, 29 L.Ed. 544; Martin v. Baltimore & Ohio R. Co., 151 U.S. 673, 678, 14 S.Ct. 533, 38 L.Ed. 311; Straton v. New, 283 U.S. 318, 328, 51 S.Ct. 465, 75 L.Ed. 1060.

96

D. Here the forum is in New York State, although it is not in a court thereof.

■ Under the law of New York State a contract is made at the time and place where the final act necessary for its formation is done. Franklin Sugar Refining Company v. Lipowicz, 247 N.Y. 465, 160 N.E. 916, 59 A.L.R. 1414; George A. Ohl & Co. v. Standard Steel Sections, Inc., 179 App.Div. 637, 167 N.Y.S. 184; Howard v. Daly, 61 N.Y. 362, 19 Am.Rep. 285; Hyde v. Goodnow, 3 N.Y. 266; and cf. Restatement of the Law of Contracts, Section 74, and the Whiteside's New York Annotations thereto.

■ According to the law of New York State, the laws of the state wherein the contract was thus made govern the contract "in matters bearing upon the capacity of the parties to contract and upon the execution, the interpretation and the validity thereof." U. S. Mortgage & Trust Company v. Ruggles, 258 N.Y. 32, 38, 179 N.E. 250, 251, 79 A.L.R. 802. Cf. Restatement of Conflict of Laws, Section 311, and Cheatham's New York Annotations thereto.

■ This, I take it, means that under New York law whether a particular kind of contract constitutes a joint venture or not, depends on the law of the place in which it was made. Cf. Restatement of Conflict of Laws, Section 325, and Cheatham's New York Annotations thereto.

II. In addition to the parties hereto, there are three other dramatis personae involved herein who should be mentioned and described at the outset of this opinion, namely:

A. John C. Grier & Company, a Michigan corporation with offices in Detroit, of which the President, Mr. John C. Grier, Jr., was the nearest man, so far as the matters herein involved are concerned, to the President of the Mueller Brass Company, Mr. Oscar Mueller, who, together with the members of his family, had the control of the stock thereof. Prior to July 1935, Mr. Grier had purchased from the Mueller Brass Company and from Mr. Mueller upwards of 40,000 shares of the common stock of the Mueller Brass Company and was, not unnaturally, anxious to broaden the market therefor.

B. Peter, Lander & Company, a Michigan corporation, a selling organization—corporately and in respect of ownership independent of John C. Grier & Company—which was operated from the same suite of offices, and existed because Mr. Grier did not wish to have any selling done by his corporation, John C. Grier & Company.

C. Melady & Company, a firm of brokers with offices in New York and memberships in the New York Stock Exchange and in the Stock Exchanges of Chicago, Winnepeg and Toronto, which did business on commission in those Exchanges, and which was represented in the proceedings hereinafter briefly described by one of its partners, Richard J. Buck.

III. In view of the decision of the United States Supreme Court rendered April 25, 1938, on Equity Rule 70½, 28 U.S.C.A. following section 723, in Interstate Circuit, Inc. v. United States, 304 U. S. 55, 56, 57, 58 S.Ct. 768, 82 L.Ed. 1146, and under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, it is now a work of supererogation to write a considered and detailed opinion on the facts in what used to be an equity cause and is now called a non-jury cause, for the place of the opinion must now be taken by formal findings of fact and conclusions of law, separately stated and numbered. Title 28 United States Code, Section 723, 28 U.S.C.A. § 723.

I shall, therefore, deal herein merely with certain general aspects of the facts, and with the conclusions of law which I draw in the cause, and leave it to counsel to submit, in accordance with my instructions at the end of this opinion, such findings of fact and conclusions of law, separately stated and numbered, as they may be advised.

IV. This is a cause in which the substantive juridical relations,—out of which the equities invoked herein are claimed to have arisen,—are wholly based on oral evidence of witnesses who testified before me at the trial.

As there is not any witness who may fairly be accused of consciously testifying falsely, what is involved here for me, as the trier of the facts, is to determine whether there are faults in emphasis on the facts made by, or mistakes in the memory of the witnesses for any of the parties.

■ As to the plaintiff's principal witnesses, Mr. Cray and Mr. Nauman, I have not any hesitation in saying that the effect of their testimony on me was to make me

feel that their alleged cause of action was nothing more than a figment. I think that they were throughout magnifying their office, and trying to turn what was only an opportunity given to the plaintiff by Mr. Hegarty through Mr. Grier, to share in any "finder's fee"[1], to which Mr. Grier might properly be entitled, into a joint venture which would cover all the bonds and stock of the Mueller Brass Company which Hegarty or his principal—unnamed at the time of the alleged contract of joint venture of July 19, 1935—might succeed in getting, in order that the plaintiff would have a basis for claiming an accounting to it from Hegarty, Conroy & Co., Inc., as a co-adventurer.

It may be said here also that—as is oftentime the case—by chewing the cud of what they conceived to be their grievances, Mr. Cray and Mr. Nauman have actually come,—I think probably without being aware of it,—so much to exaggerate those grievances in their own minds as to satisfy me, when the evidence is read in connection with the evidence of the defendants' witnesses, that they have greatly distorted in their memories the situation in regard to the Mueller Brass Company deal which existed in June, July, August and September 1935, the crucial period herein.

On the other hand, it seemed to me that the quality of all the principal witnesses for the defendants was unexceptionable. Indeed, Mr. Rathvon, Mr. Hegarty, Mr. Buck and Mr. Grier are among the best witnesses whom I have ever heard give evidence before me.

Because the essence of the cause turned wholly on oral evidence, I watched and listened to all the witnesses on both sides with especial care, and have since carefully studied it, with the result that I have no hesitation whatever in saying that the truth stands on the side of the defendants in respect of all the contested facts herein, and of all the questions of emphasis to be given en to such of the facts as are not contested.

Furthermore, it seems to me, that, in their cupidity, Mr. Cray and Mr. Nauman forgot that the persons who do almost all the work in any deal,—as did Atlas and Hegarty herein—and furnish all the money therefor—as did Atlas herein,—are, obviously, the parties thereto who become entitled to almost all the profits arising therefrom.

The plaintiff did not risk any money, and did not do anything of importance in connection with the joint venture which Mr. Cray claims existed, nor did it make any commitments in connection therewith. It merely watched and waited until success was certain, and then came confidently in and claimed as its share 20% of the profits of the deal. "Heads I win and tails you lose" cannot, I fancy, be the basis of an equity.

I think there is not anything to be criticised in the position of the defendants in this matter. Together they carried on all the negotiations that led to the fruition of the deal, and Atlas furnished all the money —$1,200,000—necessary to achieve the objectives thereof. Having paid the piper Atlas had the right to call the tune.

When the deal was closed, Hegarty received as its remuneration, in the nature of a finder's fee, from Atlas, a chance to take up 40,000 shares of Mueller Brass Company common stock at what Atlas had paid therefor, and to make a public offering thereof.

It shared this finder's fee most generously. Grier had nominated Peter, Lander & Company, a corporation associated, as

---

[1] A "finder's fee" is a sum of money that is paid by a banker to one who brings to him a deal out of which he makes money. E. g. Brown v. Leach, 189 App.Div. 158, 178 N.Y.S. 319, appeal dismissed 228 N.Y. 612, 127 N.E. 909.

As the record herein shows, a "finder's fee" is a kind of commission as to which there is no percentage fixed by custom. In the absence of any agreement thereon, the percentage allowed to the finder depends on how much work is done by him, and what his position is in the deal vis-a-vis the persons with whom the banker is negotiating it.

In "Cases and Materials on Corporation Finance" by Adolf A. Berle, Jr., it is said at page 602:

"The finder's commission is a fruitful subject of dispute. It is often not agreed on in advance, though good practice would suggest this; frequently the finder himself has to split his commission with one or more individuals who have assisted him; and his compensation is not finally determined until the transaction is agreed upon and any profit (which may be cash, stock, stock purchase warrants, or any combination of the three) is determined; and its distribution is finally determined."

above noted, with his office, Melady & Company and the plaintiff to receive the share of the finder's fee to which he might be entitled. When it was agreed by Hegarty and Atlas that Hegarty should get as a finder's fee 40,000 shares of Mueller Brass Company common stock, he offered a participation[2] in 20,000 shares, or 50% thereof, to Grier's three nominees as follows:

To Peter, Lander & Company, 25%, or 10,000 shares; to Melady & Company, 12½%, or 5,000 shares; to the plaintiff, 12½%, or 5,000 shares.

Peter, Lander & Company and Melady & Company accepted with appreciation of Hegarty's generosity the participation offered to them. The plaintiff refused the participation offered to it, although, in my opinion, the offer was much in excess of any possible quantum meruit—see footnote[2] supra—to which it was entitled for the work it had done or its position in the deal.

Then, after some futile attempts to secure a larger participation in the finder's fee than what had generously been offered to it, the plaintiff brought this suit for an accounting against Hegarty and Atlas.

V. A sufficient statement of the facts for the purposes of this memorandum is as follows:

A. Mr. Grier's Detroit office had been selling stock of the Mueller Brass Company, either owned or controlled by him, before the plaintiff had, so far as this record shows, any connection with any sales thereof.

Mr. Buck, of Melady & Company, had heard of the stock through a Mr. Eugene Stevenson, the brother of a special friend of Mr. Grier's, who had been working for a firm named Robinson & Company, and, subsequently, went to work for Melady & Company.

Mr. Grier, finding out that the plaintiff was the correspondent in Detroit of Melady & Company, suggested that Mr. Buck should do his buying of Mueller Brass Company stock through the plaintiff. The plaintiff did not do any New York trading in this stock until Mr. Buck began to buy from it under this arrangement suggested by Mr. Grier.

It is perfectly clear, therefore, that the only reason why the plaintiff happened to be in position to buy and sell the Mueller Brass Company stock, owned or controlled by Mr. Grier, was because of Mr. Grier's interest in Mr. Stevenson who was working for Melady & Company, and because it was agreed between Mr. Grier and Mr. Buck that Melady & Company should use the plaintiff in connection with the stock which Mr. Grier desired to continue to distribute in New York.

The plaintiff was, therefore, from the beginning only at the periphery of the situation here involved, and, though it has evinced strong centripetal desires, it has never succeeded in improving its position therein.

Hegarty, Conroy & Co., Inc., became interested in the Mueller Brass Company stock through a man named Campbell who had office space with Melady & Company, and after looking into the matter, and placing some shares through their clients, they began to develop the idea that they might purchase a large block of the stock from Mr. Mueller or the Mueller Brass Company, and also arrange some way of retiring the bonds thereof in order to escape from the terms of an extension plan agreed to by the bondholders on November 30, 1933, which gave the common stock a low ceiling because payment of any dividends thereon before April 1, 1937, was prevented except in certain contingencies not necessary to set forth here in detail.[3]

Beginning as early as June 10, 1935, and

2 When a participation in a deal is thus offered to a person, it means that he is given the chance to have the stock at cost plus his pro rata share of the expenses, to which the offerer has been put in the deal. Here this meant 12½% of Hegarty's expenses would fall on the plaintiff, if, in the hope of making an almost certain profit, it accepted his offer.

3 The terms of this extension plan may be conveniently summarized thus:

The trust indenture of the new extended bonds provided that one-third of all net income, after all taxes, would be applied to retirement of bonds in order of maturities and in numerical order, and that prior to April 1, 1937 no dividends might be declared or paid on any class of stock unless all bonds which would have been matured under the original schedule of maturities should have been retired out of earnings or by the sale of capital stock, the total amount being $41,300, and subsequent to April, 1937 no dividends were to be paid unless $80,000 principal amount of bonds should have been retired annually. In no case could dividends be paid which would reduce net quick assets below $750,000.

up till the meeting of July 19, 1935, hereinafter dealt with, there were several conversations had between Hegarty, Buck and Grier, looking to the retirement of the bonds of the Mueller Brass Company and the purchase of stock from it or from Mr. Mueller along the lines of the idea which Hegarty had developed.

B. After long reflection on this very interesting state of facts, it seems to me that it at once comes into focus and the plaintiff's exact position in the penumbra thereof is shown beyond peradventure, if the following technique of approach thereto be adopted:

1. Either on Monday, July 8th, or Tuesday, July 9, 1935, Mr. Hegarty, having been unable to secure banking support for his plan to get a large block of the Mueller Brass Company common stock for distribution and to arrange a refinancing of that Company, decided he would go to the Atlas Corporation, whose then vice-president, Mr. Rathvon, was a friend of long standing. When he saw Mr. Rathvon at the principal business office of the Atlas Corporation in Jersey City, New Jersey, Mr. Hegarty described the details of the situation in Mueller Brass Company to Mr. Rathvon, gave him its then recent financial history and managed to arouse in him some interest therein.

■ Mr. Rathvon, however, explained to Mr. Hegarty that he would only be interested in investment, and would not, as the phrase is, "bank the deal" [4]. This Mr. Hegarty fully understood, for he knew that Atlas did not underwrite and publicly distribute stock or advance funds for that type of business; but only went into any deal if it bought the deal for itself.

Mr. Rathvon said he would look up the Mueller Brass Company, and Mr. Hegarty accordingly kept in touch with Atlas, having a further conversation with Mr. Rathvon a little later,—perhaps about the 10th or 11th of July,—and then he was told that he would be advised after the weekend of July 14th whether Atlas might be seriously interested.

2. So, on Monday, July 15th, or Tuesday, July 16th, Mr. Hegarty went over to Jersey City and had a further discussion with Mr. Rathvon who said that, if further investigation satisfied Atlas, it would be interested in buying into the Mueller Brass Company, and, if it went into the deal, it would put up all the money that would be involved in the transaction; but, if there was a public offering of securities which Atlas did not purchase for investment, it would give Hegarty a share in such public offering with the understanding that Hegarty could take the securities down at the price for which Atlas bought them, and if Hegarty did not succeed in selling them Atlas would take them back off his hands without loss.

Neither Mr. Hegarty nor Mr. Rathvon knew whether there would be any public offering, or, if so, how many shares there would be in that offering.

The whole point of the agreement between them was that Mr. Hegarty was to start negotiations for Atlas in Port Huron, Michigan, with the Mueller Brass Company, and that Atlas guaranteed his firm against any loss.

■ This general summary of the agreement between Mr. Rathvon and Mr. Hegarty, which was arrived at in Jersey City, and is governed by New Jersey law, Cases 27 F.Supp. 95, 96, is entirely confirmed in all its essentials by Mr. Rathvon and constituted under New Jersey law, a joint venture. For under New Jersey law the sharing of profits is and the sharing of losses is not an essential part of a joint-venture, and an approximation of a partnership ad hoc is not required, although, of course, such a relationship would be recognized as a joint venture. Warwick v. Stockton, 55 N.J.Eq. 61, 65, 66, 36 A. 488; Jackson v. Hooper, 76 N.J.Eq. 185, 197, 198, 74 A. 130.

■ It seems to me that, under New Jersey law, the juridical concept, commonly called a joint venture, is graduated like a spectrum from a partnership ad hoc through various forms of fiduciary business relationships into an agency with contingent remuneration to the agent, as was the case here. Indeed, it matters little what the precise definition of a joint venture may be for the fiduciary relationship always arises

---

4 Shortly stated, "banking" a deal, as the record here shows, customarily means making to a person who wishes to consummate a deal, a loan of money on collateral for a consideration. The consideration for the loan may be interest, a fee, or perhaps a part of the securities or property involved in the deal, or a combination of each or all. The result of "banking" a deal, therefore, is that the lender is in the position of a secured creditor, and not either of a participant or of an investor therein.

from it, as it does from an agency, and the remedial sequelae are of the same kind.

Herein, in fact, Atlas felt throughout that it was in the position of principal, that it would only act as such in the matter, and that Hegarty was its agent therein.

Indeed, Mr. Rathvon said that "Hegarty, Conroy could have only one or two possible relations in this deal if we became the principal; one, they could be entitled to what is generally terms as a finder's fee for bringing them (that is the Mueller Brass Company) to us, or they could be associated in some way to the deal that fitted with our requirements in the matter, and the only way they could become associated would be in relation to a public distribution of the stock."

Mr. Hegarty having truly assured Mr. Rathvon that he was in a position to deal with Atlas on that basis, he was given instructions to go ahead, and the statistical department of Atlas started getting further data on the Mueller Brass Company.

Mr. Rathvon agreed that if Hegarty could get an option from Mr. Mueller and the Mueller Brass Company on a block of its stock, Atlas would spend, at its own risk, the necessary money to make a thorough investigation.

3. Then Mr. Conroy went to Detroit, and, as a result of his negotiations, the agreement of July 26, 1935, was made with Mr. O. B. Mueller at Port Huron, Michigan.

■ When Mr. Rathvon saw this agreement he was not satisfied with it because what he had wanted to get was an option which would give him a chance to make a thorough investigation of the Mueller Brass Company. He regarded the agreement of July 26th as too much in the nature of a commitment which did not give enough "outs"[5] to Atlas.

4. Consequently, Mr. Rathvon went to Detroit himself on July 29th or 30th, and was there for two days during which time he negotiated the contract of July 31, 1935, with Mr. Mueller. This contract took the form of a letter from Hegarty, Conroy & Co., Inc., to Mr. Mueller, approved by him, and contained the reassuring "outs" which naturally are in a banker's eyes among the most valued terms in any contract.

Thereafter the investigation of the Mueller Brass Company proceeded more intensively through engineers, patent lawyers and accountants, and finally it was found that its recent earning statement was not satisfactory.

Mueller and Mueller Brass Company agreed that a specific "out" was thus established.

■ 5. Negotiations then proceeded on a new basis, and, eventually, two contracts were entered into on August 20, 1935, at Port Huron, Michigan, one between Hegarty, Conroy & Co., Inc.—acting, as I find, as agent for Atlas—and the Mueller Brass Company, and the other between Hegarty, Conroy & Co., Inc.—acting, as I find, as agent for Atlas—and O. B. Mueller. These contracts, each of which contained appropriate "outs", may for present purposes be briefly summarized as follows:

The contract with the Mueller Brass Company involved the purchase by Hegarty (acting, as I find, as agent for Atlas) of the outstanding bonds of the Company for $630,000 and a provision for the substitution therefor of bonds convertible into stock.

The other contract provided (1) for the purchase by Hegarty (acting, as I find, as agent for Atlas) from Mr. Mueller of 40,000 shares of common stock at $14.25 per share, and (2) for certain options for the purchase of additional shares within a period of 120 days from the date on which the transfer of the 40,000 shares occurred.

The idea of having the Mueller Brass Company buy in their then outstanding bonds and substitute for them convertible bonds for the same principal amount, instead of having it issue stock and buy in its bonds, was the ingenious suggestion of Mr. Rathvon which he thought might be compensatory to Atlas in view of the somewhat disappointing earnings statement of the Mueller Brass Company, because it would give Atlas a call for the stock thereof which was to be purchased, plus ad interim security.

After it had been decided that the contract of July 26, 1935, was not satisfactory and would have to be re-negotiated, Mr. Rathvon had a conversation with Mr. Hegarty referring to the previous arrange-

---

[5] "Outs", in banking parlance, are conditions or warranties, failure to comply with which by the prospect give the banker a right to escape from a contract and call negotiations off.

ment between them, in which Mr. Rathvon said that, if he could negotiate a revision of the contract along lines which would satisfy him, Atlas would proceed, and would take all commitments involved in the deal, and that Hegarty would be looked after through a public offering, if one could be made, or, if not, that the deal would be handled in such a way that Hegarty would be allowed a reasonable profit for his services in the matter.

6. It is obvious that, as a result of the contract which had been made in Jersey City on July 15th or 16th by Mr. Hegarty and Mr. Rathvon, whether the relation thereby created was a joint venture—cf. cases above cited—or merely an agency by which Hegarty was constituted an agent of Atlas for the purpose of negotiating a deal with the Mueller Brass Company, Hegarty would be in the eyes of equity precluded from making any contract with Mueller or the Mueller Brass Company which would exclude Atlas from such interest therein as it might wish to make. E. g. Irving Trust Company v. Deutsch et al., 2 Cir., 73 F.2d 121, 124.

Consequently, on July 15 or 16, 1935, a fiduciary relationship arose between Hegarty and Atlas in which Hegarty was the fiduciary and Atlas was the beneficiary, and by which there was created what I might call an equity of preclusion, preventing Hegarty from acting in any way in derogation of the rights of Atlas in the objective before them both.

7. That was the legal situation as between Atlas and Hegarty when we come to the much discussed meeting in New York City of July 19, 1935, out of which the plaintiff claimed a joint venture arose between Grier & Company, Melady & Company, Hegarty, Conroy & Co., Inc., and the plaintiff Cray, McFawn & Company.

When Mr. Hegarty entered the July 19th meeting, all that he could offer to the other parties present without trenching on his fiduciary duty to Atlas was a share in any finder's fee or stock "in the nature of a finder's fee" which he might receive from Atlas.

He had not any authority, express or implied, to enter on behalf of Atlas into any contract of joint venture, or to deal in derogation of its rights in any other way with the persons present at the July 19th meeting.

Mr. Cray happened to be present at that meeting because being in New York City on other business he dropped in to see Mr. Buck and was asked by him to come to the meeting.

Mr. Hegarty had not met Mr. Cray or known of the plaintiff before the meeting of July 19th. This is important because the dilectus personarum which is at the core of all joint ventures, just as it is at the core of all partnerships, cannot be easily presumed among new acquaintances, especially in respect of such a large undertaking as the plaintiff now claims to have been involved.

I find that Mr. Hegarty did tell the other persons present at the July 19th meeting that he alone of those present was taking any commitments as to Mueller Brass Company stock, that any participation they got must be "in the nature of a finder's fee" secured out of a public offering, if any, of such stock, and that no one knew what form the deal would take or how much Mueller Brass Company stock, if any, would be offered to the public.

Mr. Hegarty gave some testimony on direct examination which much impressed me and which I think correctly summarized the meeting of July 19th.

He thus described the termination of the meeting:

"Q. Was anything else said? A. I ended up by saying that after all they had no commitment, nothing to risk in the deal, that whatever they got would be like finding it in the middle of the street, so on that general note and after again repeating that no possible split could be made because nobody knew what was going to be split, we got ready to get up; and finally Mr. Cray, who tried to get us to reduce it to something more specific, after we were getting up to get out, said 'Wouldn't something like 40, 20, 20, 20 be about right, Hegarty, Conroy getting about twice as much as anybody else, because they were buying the bargain?'

"Q. And what did you say to that, if anything? A. I had already answered the question just five minutes previous to that by saying nobody could make any agreement or any contract, they didn't know what we had to split up.

"Q. Mr. Hegarty, did you or did you not affirmatively assent to the suggestion which you say was the last thing mentioned at this meeting when Mr. Cray suggested

this 40, 20, 20, 20 division? A. Definitely not."

I believe this evidence.

I find that the parties present at the July 19th meeting were at arm's length when they entered that meeting, and I find they were still at arm's length when they left it and went their several ways.

Consequently, no joint venture with its resulting fiduciary relationships between the parties thereto could have arisen out of that meeting.

8. Furthermore, I find that there was not anything in the trading in the stock between the meeting of July 19th and the contracts of August 20th which finally crystallized the deal which by itself pointed to any fiduciary relationships between the parties to the meeting of July 19th.

Indeed, on this I understand plaintiff's counsel finally agreed with me at the argument, placing his whole case on the July 19th meeting.

VI. What happened at the July 19th meeting in New York City could not, therefore, in my opinion, have resulted in a joint venture under the law of New York State which was the law applicable to it. For a joint venture under that law cannot be left with so many loose ends.

Under Samuel v. Bastress, 1935, 267 N. Y. 279, 196 N.E. 57, the Court of Appeals held that the terms of a joint venture should be definitely settled. There should be an agreement either express or implied as to the sharing of losses as well as profits, and, semble, equality of such sharing is not to be presumed. Also each joint venturer must have a right to share control or direction in the negotiations of the venture. In effect, a partnership ad hoc must be established.

The case just cited may fairly be described as an italicised case on the much mooted subject of joint ventures because the trial court had found that there was not a joint venture, but had been reversed by the Appellate Division for the Second Department, which had made a new set of findings of its own, but was in its turn reversed by the Court of Appeals.

The situation resulting from the July 19th meeting may be summarized by saying that it was known to those present that Hegarty alone was to make any commitments, i. e., to undertake any obligation with respect to the purchase of the Mueller Brass Company stock; that there was

not any agreement made as to the price to be paid for that stock, and that no one present—except Mr. Buck who had correctly guessed it—knew about the source of the money available for the purchase thereof.

All that was known was that Hegarty had procured someone, who, if satisfied with the Mueller Brass Company's situation, would put up the money; but no one present knew what part of the deal the person putting up the money was going to take, and no one except Hegarty, who had already, as above noted, been deputized by Atlas to treat in its behalf with Mr. Mueller and the Mueller Brass Company, was to have any part in negotiating the deal.

It is fair again to say that, as a result of the long trial in this cause, it finally became common ground that the only source of a fiduciary relationship would be the meeting of July 19th, and as I find that a fiduciary relationship did not arise as a result of that meeting, the plaintiff has not any right to an accounting from Hegarty, Conroy & Co., Inc., herein, and, of course, not against the Atlas Corporation for it was in the position of any one who determines to buy something and is first in the field in pursuing his objective.

VII. Counsel for the two defendants must collaborate in preparing, and must submit to me through the Clerk's office, findings of fact and conclusions of law in pursuance of Rule 52(a) and in accordance with this opinion.

They must give five days' notice thereof to counsel for the plaintiff.

Counsel for the plaintiff may on the return day of such notice submit to me criticisms of the findings of fact by the defendants' counsel, if he be so advised.

As under Rule 52(a) only the findings of fact and conclusions of law which I sign will be filed as part of the record herein, I suggest this course for the plaintiff's counsel because counter findings will not avail him anything. He must take his objections, if any, to my findings, on appeal by way of appropriate assignments of error.

VIII. After the findings of fact and conclusions of law are signed by me, a decree dismissing the complaint and carrying costs, providing for recovery by each of the defendants of their costs, and of their taxable disbursements and allowances, may be submitted to me through the Clerk's office on the usual notice.