[799 NYS2d 437]

Lazard Freres & Co., LLC, Appellant-Respondent, v West*Group Properties LLC et al., Respondents, and RA West, Inc., et al., Appellants, et al., Defendant.

First Department, July 7, 2005

APPEARANCES OF COUNSEL

*Friedman Kaplan Seiler & Adelman LLP*, New York City (*Eric Seiler* and *Emily A. Stubbs* of counsel), for appellant-respondent.

*Arnall Golden Gregory LLP*, Atlanta, Georgia (*Robert L. Rothman* of the Georgia Bar, admitted pro hac vice, of counsel), and *Cohen & Gresser LLP*, New York City (*Mark S. Cohen, Kathleen L. Turland* and *Elizabeth F. Bernhardt* of counsel), for appellants.

*Sutherland Asbill & Brennan LLP*, Washington, D.C. (*Lovida H. Coleman, Jr.*, of the District of Columbia bar, admitted pro hac vice, of counsel), and *Shatzkin & Mayer, P.C.*, New York City (*Karen Shatzkin* and *Debra A. Mayer* of counsel), for respondents.

## OPINION OF THE COURT

SAXE, J.

This appeal requires a close reading of an agreement, entered into by highly sophisticated business entities, contemplating the marketing by Lazard Freres & Co. of membership interests in defendants West*Group Properties LLC and West*Group Management LLC (collectively, West*Group or the Company). Plaintiff Lazard Freres is an investment banking firm; defendants West*Group Properties LLC owns and develops real property, and West*Group Management LLC manages that property; the total appraised value of West*Group in 2000 was over $400 million. At the time of the parties' agreement, defendants RA West, Inc. and Rolim West LLC (collectively the Rolim entities) held 48.12% of the membership interests in West*Group, and defendant Park Gate Group LLC similarly held 48.12%, with the remaining 3.76% of membership interests held by employee incentive programs.

On May 12, 2000, Lazard Freres entered into an agreement with West*Group, for the marketing of interests in West*Group. The relevant part of the preamble to the agreement established that Lazard Freres was engaged to act

> "in connection with . . . (iii) a sale, directly or indirectly, of all or substantially all of the membership interests in the Company . . . held by either

> PARK GATE GROUP LLC or the Rolim Entities
> . . . or (iv) a financing of the Company providing
> cash for distribution to the members of the Company
> and redemption of all or substantially all of the
> membership interests in the Company held by ei-
> ther PARK GATE GROUP LLC or the Rolim Enti-
> ties excepting Excluded Transactions (as hereinaf-
> ter defined)."

According to paragraph 3 (a), if Lazard succeeded, it was to receive a transaction fee of $4,500,000. If Lazard was only able to successfully market either the interests owned by Park Gate or those owned by the Rolim entities, paragraph 3 (b) entitled Lazard to a partial transaction fee as defined in the agreement. Park Gate and the Rolim entities each signed an addendum to the agreement

> "for the purpose of acknowledging [their] separate
> agreement to pay a Transaction Fee to Lazard as
> determined in accordance with the foregoing agree-
> ment . . . . [I]t is understood and agreed, however,
> that no such member has any liability or obligation
> for amounts that may become due or owing by the
> Company under the foregoing Agreement or by the
> other member(s) of the Company."

Pursuant to paragraph 9 (a), the agreement could be terminated by either party without cause. If it was terminated by West*Group, though, the provision obligated West*Group to notify Lazard in writing of any prospective investors with whom it had dealt during the period that the agreement was in effect. If during the six months after the termination of the agreement (the Tail Period) a transaction was completed with one of those investors (the Tail List Investors), or with an investor not on that list (an Undisclosed Investor), Lazard was entitled to a transaction fee.

The agreement also provided in paragraph 9 (b) that

> "in no event shall the Company or any member(s)
> thereof (i) owe any Transaction Fee to Lazard for or
> arising from any sale or transfer, directly or indi-
> rectly, of interests in the Company among persons
> or entities who or which now directly or indirectly
> own an interest in the Company."

On September 7, 2000, West*Group terminated the agreement pursuant to paragraph 9 (a). Then, in a transaction on December 21, 2000, West*Group redeemed, at a price of more

than $137 million, all interests in West*Group held by the Rolim entities, pursuant to an option Park Gate had obtained from nonparty CGR Advisors. This redemption was financed, in part, by a commercial loan West*Group obtained from Wells Fargo Bank, as well as by funds obtained from the sale of certain properties owned by West*Group. This December 21, 2000 transaction forms the basis of Lazard Freres' claim of a right to a partial transaction fee of approximately $3 million, arguing that the redemption occurred during the Tail Period of the agreement and that Wells Fargo served as an Undisclosed Investor. Defendants claim that the deal falls outside the types of transaction contemplated by the agreement.

Lazard commenced this action on April 20, 2001 against West*Group, Park Gate, and the Rolim entities, seeking payment of the partial transaction fee plus interest. All parties moved for summary judgment. In an order entered July 20, 2004, the IAS court dismissed the claims against West*Group and Park Gate, and granted Lazard judgment against the Rolim entities in the amount of $3,808,975.24.

Lazard appeals from the dismissal of its claim against West*Group; the Rolim entities appeal from the judgment as against them.

## Discussion

As the Court of Appeals stated in *W.W.W. Assoc. v Giancontieri* (77 NY2d 157, 162 [1990]), "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." The written agreement at issue here, though complicated, constitutes such a clear, complete document.

The initial issue presented is whether the transfer to West*Group of all of the Rolim entities' interest in West*Group, structured as a redemption, and resulting in an increase in Park Gate's equity position in West*Group, is the type of transaction contemplated by the agreement. If the transfer is such a transaction, the issue then becomes whether it is one that would entitle Lazard to a fee, and from whom.

The preamble to the agreement defines the types of transactions to which the agreement applies. It is undisputed that the first two subsections are inapplicable to the present dispute. Subsection (iii) of the preamble defines one type of covered transaction as "a sale, directly or indirectly, of all . . . of the

membership interests in the Company held by either PARK GATE GROUP LLC or the Rolim Entities." While there may be a certain logic to characterizing the transaction at issue here as a "sale" in view of the use of sales terminology in the underlying documents, and since the transaction had the basic hallmarks of a sale in that the Rolim entities transferred their shares to West*Group in exchange for cash, we nevertheless agree with the IAS court: the transaction at issue instead falls within subsection (iv), i.e. "a financing of the Company providing cash for distribution to the members of the Company and redemption of all . . . of the membership interests in the Company held by either PARK GATE GROUP LLC or the Rolim Entities." Inasmuch as the parties saw fit to explicitly distinguish between a financed redemption of interests and a sale of such interests, in applying the agreement to the parties' circumstances it is appropriate that we abide by that distinction.

The type of transaction to which subsection (iv) was intended to apply required *both* a financing providing cash to the membership interests *and* a redemption of one of the members' interest. No dispute of fact precludes the determination as a matter of law that this subsection applies to the parties' circumstances. Clearly, West*Group did redeem all of the interests in the Company held by the Rolim entities. Further, it was asserted, without dispute, in the deposition of West*Group's chief financial officer, Peter Ognibene, that as a result of the financing a distribution of cash was paid out to the members of the company, by which both Rolim and Park Gate received money. Thus, the redemption of Rolim's interests constitutes a transaction pursuant to subsection (iv) of the agreement's preamble.

West*Group argues that because Park Gate indirectly acquired the Rolim entities' interest in West*Group, the deal was actually an intracompany transfer that falls within the exception provided for in paragraph 9 (b). The exception within paragraph 9 (b) provides that:

> "in no event shall the Company or any member(s) thereof (i) owe any Transaction Fee to Lazard for or arising from any sale or transfer, directly or indirectly, of interests in the Company *among persons or entities who or which now directly or indirectly own an interest in the Company*" (emphasis added).

However, in our view, the clear import of this language is that Lazard would not be entitled to a fee if a transaction were to take place between persons or entities with membership

interests in West\*Group, primarily Rolim and Park Gate, for example, if Park Gate had acquired the Rolim entities' interest in West\*Group. That is not what happened. West\*Group, not Park Gate, was the entity that acquired Rolim's interests. Although Park Gate's proportionate interest in West\*Group increased to 91% as a result of West\*Group's redemption of Rolim's membership interests and concomitant cancellation of those shares, the Rolim entities' interest was neither obtained by nor transferred to Park Gate, and Park Gate cannot be said to now own the Rolim entities' interest. Thus, this portion of paragraph 9 (b) does not apply to render the agreement inapplicable to the transaction. The redemption is a transaction covered by the preamble to the agreement.

There still remains a question as to whether the remaining requirements of the agreement are met so as to entitle Lazard to a transaction fee. Since the deal took place after the agreement's termination, paragraph 9 (a) applies as follows:

> "Lazard shall remain entitled to full payment of all fees contemplated by paragraph 3 hereof in respect of any Transaction (i) with a *Prospective Investor* identified by Lazard on a list of not more than 25 Prospective Investors (the 'Tail List Investors') . . . or *with any other investor or purchaser* with whom or which the Company, Park Gate Group LLC or Wells Hill Partners Ltd. communicated during the Term of this Agreement . . . (an 'Undisclosed Investor'), and (ii) consummated with such Tail List Investor or Undisclosed Investor in a Closing completed within six (6) months following such termination or expiration, as the case may be (the 'Tail Period')." (Emphasis added.)

Therefore, Lazard must establish that the transaction was with an identified "Prospective Investor" or any other "investor" with whom West\*Group communicated during the term of the agreement.

The IAS court rejected Lazard's characterization of Wells Fargo as an "Undisclosed Investor" contemplated by paragraph 9 (a). It distinguished between commercial lenders and capital investors, and rejected Lazard's argument that a bank providing financing is a "debt investor" and should therefore be considered an investor under this paragraph, reasoning that posttermination liability could only inure from an equity transaction, not a debt transaction, and that the term "investor"

under this paragraph was intended to mean "capital investor." The IAS court also rejected Lazard's claim that West*Group itself should be considered an Undisclosed Investor, explaining that the agreement contemplated only potential third-party investors.

Here too we agree with the IAS court. Lazard's logic, by which the term "investor" must be understood as any provider of financing that falls within subsection (iv) of the agreement's preamble, is at odds with the definition of the term "Prospective Investors" in paragraph 1 (b) of the agreement as "persons or entities which might be interested in acquiring the Company or all or substantially all of its properties and . . . approved by the Company in its sole discretion in writing." This is the best evidence of what the parties understood the term "investor" to mean (see Slamow v Del Col, 79 NY2d 1016, 1018 [1992]). Such understanding is supported by Barron's Dictionary of Business Terms, which defines an "investor" as a "party who purchases an asset with the expectation of financial rewards" (3d ed 2000). Clearly, a lender such as Wells Fargo, who provides funds for a refinancing of the borrower's properties, would not qualify as an investor under this definition. Case law supports the same conclusion (see Bankers Trust Co. v Dowler & Co., 47 NY2d 128, 134 [1979]; Cray, McFawn & Co. v Hegarty, Conroy & Co., 27 F Supp 93, 99 n 4 [SD NY 1939], affd 109 F2d 443 [2d Cir 1940]). Although these cases may not create a universal truth that a lender is never an investor, Lazard's submissions fail to demonstrate that this is the rare instance where a lender is actually serving as an investor.

Nor is there any merit to Lazard's contention that West*Group itself must be characterized as an "Undisclosed Investor." The agreement clearly contemplated that West*Group was required to identify only potential third-party investors.

Thus, although the redemption qualifies as a covered transaction under the agreement, it took place after the agreement was terminated, and thus the lack of an "investor" as contemplated by the agreement precludes Lazard from successfully claiming entitlement to a fee from West*Group. Lazard suggests that it is incongruous to construe the agreement as allowing it to earn a fee on a particular type of transaction while the agreement was operative but not once the agreement was terminated. However, any such incongruity was written into the contract by the inclusion in paragraph 9 (a) limiting the terms upon which a fee would be earned following termination.

Accordingly, that portion of the trial court's ruling that awarded summary judgment to West*Group must be affirmed.

As to the contention of the Rolim entities that the judgment against them must be reversed, Lazard was properly awarded a partial transaction fee as against them based upon the following portion of paragraph 9 (b):

> "(however, a member of the Company which transfers all or substantially all of its interests in the Company in the Closing of a Transaction which is completed during the Term of this Agreement, or prior to expiration of the Tail Period . . . shall be responsible to Lazard for the portion of any Partial Transaction Fee relating to the membership interests that it sells or transfers in such Transaction)."

The foregoing language is an exact description of the transaction that took place here. Furthermore, in the addendum to the agreement, Park Gate and Rolim each agreed to pay a transaction fee to Lazard

> *"if it engages in a Transaction involving the sale or refinancing of its entire interest in the Company and such Transaction is consummated with payment to such member of all amounts due in connection herewith prior to expiration of the Tail Period* in accordance with paragraph 9 (a) of the foregoing Agreement; it is understood and agreed, however, that no such member has any liability or obligation for the amounts that may become due or owing by the Company under the foregoing Agreement or by the other member(s) of the Company." (Emphasis added.)

These two provisions make clear that as long as one of the members, Park Gate or Rolim, conveyed all of its interest in West*Group, in exchange for payment, as contemplated by the related agreement between Lazard and West*Group, the member that conveyed its interest must pay a fee to Lazard, to the extent the amount was not payable by West*Group.

The language of the agreement does not support Rolim's argument that the redemption of its shares did not qualify as a covered transaction, because the entity obtaining its shares must be an investor as defined in the agreement. The portion of paragraph 9 (a) upon which Rolim relies, which states that West*Group shall be liable for a posttermination transaction with an "Undisclosed Investor," by its terms applies only to

West\*Group, not to its members, Rolim and Park Gate. In addition, Rolim's assertion that it can only be liable if all of the conditions of liability on the part of West\*Group are met is flatly contradicted by the addendum's statement that Rolim would be liable to pay a transaction fee for completing a transaction "of its entire interest in [West\*Group]" during the Tail Period as long as West\*Group was *not* liable to pay that fee.

As to Rolim's argument that the addendum limits the transactions for which it would have to pay Lazard a fee to only the "sale or refinancing" of its interest, the IAS court correctly observed that the language of the addendum is reasonably understood to require Rolim to pay a partial transaction fee if it conveys, during the Tail Period, all of its interests to an entity other than a comember, which would include West\*Group itself.

Thus, since paragraph 9 (b) specifically provides that a member of West\*Group which transfers its interest to an entity other than another member owes Lazard a transaction fee, and West\*Group itself is not liable for the fee, the Rolim entities owe Lazard the partial transaction fee as directed by the IAS court. We therefore also affirm that portion of the trial court's ruling.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Herman Cahn, J.), entered July 20, 2004, which granted the motion of defendants West\*Group Properties LLC and West\*Group Management LLC for summary judgment dismissing the complaint as against them, denied the motion of RA West and Rolim West for summary judgment dismissing Lazard's complaint as against them, and awarded plaintiff Lazard Freres & Co. judgment in the amount of $3,808,975.24 against the Rolim entities, should be affirmed, without costs.

Tom, J.P., Friedman, Marlow and Catterson, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered July 20, 2004, affirmed, without costs.